**STATE of Tennessee**

**v.**

**Kevin Lebron HINTON.**

Court of Criminal Appeals of Tennessee, at Knoxville.

July 7, 2000.

Application for Permission to Appeal Denied by Supreme Court Feb. 20, 2001.

William H. Ortwein, Chattanooga, Tennessee, for the appellant, Kevin Lebron Hinton.

Paul G. Summers, General and Reporter; Patricia C. Kussmann, Assistant General; William H. Cox, III, District General; Bates W. Bryan, Assistant District and C. Leland Davis, Special Prosecutor, for the appellee, State of Tennessee.

## OPINION

Before TIPTON, J., delivered the opinion of the court, in which WOODALL, and GLENN, JJ., joined.

Kevin Lebron Hinton appeals from his convictions for first degree murder, attempted first degree murder, and especially aggravated robbery. He contends that the evidence is insufficient, that the trial court erred by denying his motion to suppress his statement, that he received ineffective assistance of counsel, that the trial court erred by failing to grant a continuance, that the trial court erred by admitting a 9-1-1 tape into evidence, and that the trial court erred by failing to grant a mistrial due to the prosecutor's improper statements during opening and closing. We hold that all issues except the suppression issue are without merit. With respect to the suppression issue, we hold that the trial court should have suppressed the statement because it was made during the course of plea negotiations, and the defendant did not waive his rights pursuant to Rule 410, Tenn. R. Evid., and Rule 11(e)(6), Tenn. R.Crim. P. The convictions are reversed and the case is remanded to the trial court.

The defendant, Kevin Lebron Hinton, appeals as of right from his convictions by a jury in the Hamilton County Criminal Court for first degree felony murder; attempted first degree murder, a Class A felony; and especially aggravated robbery, a Class A felony. For the felony murder conviction, the defendant was sentenced to life without parole. As a Range I, standard offender, he was sentenced to twenty-two years in the Department of Correction for the attempted first degree murder conviction. For the especially aggravated robbery conviction, the defendant was sentenced to twenty years in the Department of Correction. The defendant presents the following issues for our review:

1. whether the evidence is sufficient to support the felony murder conviction;

2. whether the trial court erred by denying his motion to suppress a statement he made to the police;

3. whether his attorney was ineffective by failing to ensure that any statements he made were in the course of plea negotiations and could not be used against him;

4. whether the trial court erred by failing to grant a continuance upon the state's failure to provide proper notice of its intent to seek an enhanced punishment;

5. whether the trial court erred by admitting into evidence a 9-1-1 tape; and

6. whether the trial court erred by failing to grant a mistrial when the prosecutor made prejudicial comments during opening statement and closing argument.

We reverse the judgments of conviction because of the trial court's erroneous admission into evidence of the defendant's

statement, and we remand the case to the trial court.

At trial, Thomas "Butch" Cripps testified that he owns the Kwik–E Liquor Store on Rossville Boulevard and that Chris Calloway, the murder victim, worked at the store part-time. Mr. Calloway was working on the night of September 27, 1995, and Mr. Cripps came to the store at 10:45 to close it. Mr. Calloway stayed in the store talking to Mr. Cripps. Mr. Cripps testified that the defendant entered the store and walked up and down the aisles, looking around. The defendant then bought a miniature bottle of Canadian Mist and left the store. A few seconds later, another man entered the store wearing a ski mask and carrying a gun. The man put the gun to Mr. Calloway's head and made him walk to the counter with his hands raised. The man took a gun from Mr. Cripps's waistband, emptied the cash register, and demanded to know the location of the safe. Mr. Cripps told the man that he did not have a safe but gave him the rest of the money that was in a bag underneath the cash register. The man made Mr. Cripps and Mr. Calloway lie on the floor with their hands behind their heads. The man then walked over to Mr. Calloway and shot him in the back of the head. Mr. Cripps said that he jumped up and fought the man out of the store and that the man shot him in the hand and shoulder. The man ran behind the store, and Mr. Cripps went inside the store and called 9–1–1. Mr. Cripps said that Mr. Calloway was dead when he returned. Mr. Cripps testified that a hidden video surveillance camera recorded the incident. The videotape was played for the jury and was admitted into evidence.

Johnny Haynes testified that he is the custodian of the 9–1–1 tapes and that a call was received by 9–1–1 on September 27, 1995, at 11:02 p.m. from 4409 Rossville Boulevard. The tape of the call made by Mr. Cripps was played to the jury and admitted into evidence. During the call, Mr. Cripps reported that he and his employee had been shot by a black male in his early twenties.

Chattanooga Police Department Detective Charles Russell testified that when he arrived at the scene, he learned that the defendant had been detained with his car in a gravel parking lot south of the liquor store. Detective Russell testified that a drainage ditch and brush growth separated the gravel lot from the store and that the defendant's car was backed up to an alley and was facing Rossville Boulevard.

Detective Miller testified that he interviewed the defendant on February 4, 1997, and that the defendant gave a statement. The statement was tape recorded and transcribed. The tape was played for the jury and admitted into evidence. In his statement, the defendant stated that early in the day on September 27, he, Frederick Miller, and Gary Fitch were drinking but ran out of money. He and Miller decided to rob someone. They drove around in the defendant's car, and Miller picked out the liquor store. The defendant entered the store first to see how many people were inside and if it had a security camera. The defendant walked around the store, bought a small bottle of Canadian Mist, and went outside to the car. He told Miller that two people were in the store and that he did not see a security camera. Miller put on the defendant's toboggan, the defendant gave him his loaded gun, and Miller went inside.

The defendant stated that two police officers drove up to his car and asked what he was doing. He told the officers that his headlights were not working. He gave the officers his identification, and then they heard shots fired. The officers investigated the shooting and determined that Mr.

Calloway was dead. They took the defendant to the station for questioning but then let him go. The defendant stated that he then looked for Miller at Miller's cousin's house. He said he told Miller's cousin that Miller had shot and killed someone and that they needed to get out of town. The defendant said he then went to Gary Fitch's house and told him that Miller had killed someone. He said that Miller came to Fitch's house and told him not to worry because the case was circumstantial. He said Miller told him that he had "put up" the gun. The defendant then left, and Miller left town.

Chattanooga Police Department Officer Jerry Taylor testified that he and his partner, Joseph Brooks, were on patrol on the night of September 27. He said that they were driving on Rossville Boulevard when he glanced at the liquor store and saw a male coming out of the alley behind the store. The officers drove behind the store to the gravel lot and saw the defendant's car parked next to the bushes. The defendant immediately turned on his headlights when they approached. The officers turned on their blue lights and got out of the car. Officer Taylor asked the defendant what he was doing, and the defendant said that his headlights were not working. The defendant produced his driver's license, and then they heard shots fired. Officer Brooks stayed with the defendant while Officer Taylor investigated the shooting. Officer Taylor testified that the man he saw walking from the alley to the store was not the defendant.

JoHanna Skelton testified that she is Frederick Miller's aunt and that she knows the defendant. She said that the men were good friends. She said that after the shooting, the defendant came to her apartment and said that the police had been questioning him. He asked where Miller was, and Ms. Skelton told him that

she did not know. She said the defendant stated, "We shot somebody and I need to get in contact with Fred because we [sic] in some trouble."

Dr. Charles Harlan testified that he is a forensic pathologist and a county medical examiner. He performed the autopsy on Mr. Calloway and testified that Mr. Calloway died from a gunshot wound to the back top of the head. He said that the wound was consistent with Mr. Calloway lying on the ground and being shot in the back of the head by someone in front of him.

## I. SUFFICIENCY OF THE EVIDENCE

The defendant contends that the evidence is insufficient to support his felony murder conviction. He argues that because the shooting occurred after Miller received the money, it was collateral to and not in perpetration of the robbery. He further argues that Miller's shooting Mr. Calloway was not foreseeable and that he cannot be held responsible for Miller's actions. The state contends that the evidence is sufficient.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). This means that we do not reweigh the evidence but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn.1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978).

To convict the defendant of first degree felony murder, the state was required to prove the "killing of another committed in the perpetration of any . . . robbery. . . ." Tenn.Code Ann. § 39–13–202 (1995 Supp.) When one enters into a scheme with another to commit one of the felonies enumerated in the felony murder statutes, and death ensues, both defendants are responsible for the death regardless of who actually committed the murder and whether the killing was specifically contemplated by the other. *State v. Brown,* 756 S.W.2d 700, 704 (Tenn.Crim. App.1988). Although the defendant argues that Mr. Calloway's death was not foreseeable, the evidence at trial showed that the defendant and Miller planned to rob the liquor store. The defendant went in first, canvassed the store, and reported his findings to Miller. He then gave Miller a loaded gun and a ski mask. Miller then entered the store, robbed it, and shot Mr. Calloway. The evidence establishes that the defendant was an active participant in the robbery and, as such, he became accountable for all consequences flowing from the robbery. *Id.* Arming a codefendant with a loaded gun and a ski mask to use during the perpetration of a robbery certainly makes any ensuing death or injury foreseeable, even if not specifically contemplated.

Furthermore, the defendant's argument that Mr. Calloway's death did not occur during the perpetration of the robbery is without merit. Our supreme court has stated that "consideration of such factors as time, place, and causation is helpful in determining whether a murder was committed 'in the perpetration of' a particular felony." *State v. Buggs,* 995 S.W.2d 102, 106 (Tenn.1999) (citing *State v. Lee,* 969 S.W.2d 414, 416 (Tenn.Crim.App. 1997)). "The killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." *Buggs,* 995 S.W.2d at 106. In the present case, the killing occurred in the store, immediately after Miller obtained the money from the victims. The proof establishes sufficient connection of time, place and continuity of action to show that the killing occurred in perpetration of the robbery. *See generally Brown,* 756 S.W.2d at 702–03 (concluding that the fact that the robbery was complete before the victim was killed did not make the murder collateral to the robbery).

## II. MOTION TO SUPPRESS

The defendant contends that the trial court erred by denying his motion to suppress the statement he made to police on February 4, 1997, in which he admitted his participation in the offenses. He contends that the statement is inadmissible because it occurred during plea negotiations. *See* Tenn. R. Evid. 410(4); Tenn. R.Crim. P. 11(e)(6). The state contends that the statement did not occur during the course of plea negotiations because such negotiations had not yet begun and that, in any event, the defendant waived his rights.

At the hearing on the motion to suppress, Tom Evans testified that he is an assistant district attorney general and that he handled the defendant's case in sessions court. Edward Landis was the defendant's attorney at that time. Mr. Evans testified that the defendant had attempted to speak with police officers because he wanted to testify against Miller. He said that everyone agreed that officers would interview the defendant, and based upon what he said, the state might make a plea offer. Mr. Evans said that no offer was made before the defendant was interviewed.

The defendant was first interviewed on January 28, 1997. The defendant and his attorney were present, along with Mr. Evans, Detective Russell, and Detective Larry Schroyer. Mr. Evans testified that the defendant was advised of his *Miranda* rights, during which he was informed that his statement could be used against him, and he signed a rights waiver form. Mr. Evans said that the defendant did not provide any helpful information, and the interview was stopped. Everyone agreed that another interview would be conducted the next week.

The second interview was conducted on February 4. Mr. Evans stated that he did not attend the interview because he was sick. During that interview, the defendant provided the statement that was entered into evidence at trial in which he admitted his involvement in the offenses. Mr. Evans stated that after obtaining the statement, he entered into an agreement with the defendant in which the defendant agreed to testify truthfully at Miller's trial in exchange for a twenty-year sentence for second degree murder. The defendant ultimately did plead guilty to second degree murder. However, Mr. Evans testified that two days before Miller's preliminary hearing, he learned that the defendant would not testify against Miller and would likely move to withdraw his guilty plea. Mr. Evans said that he had to move to dismiss the charges against Mr. Miller due to lack of evidence. He said he then filed a motion to set aside the defendant's guilty plea, which the trial court granted.

Mr. Evans testified that he would not have offered the defendant a plea involving a twenty-year sentence without first hearing what the defendant had to say. He said that the defendant's plea agreement did not involve him giving a statement; rather, it involved him testifying truthfully at Miller's trial. Mr. Evans testified that no offer was made before the defendant gave a statement, although he said he may have indicated to Mr. Landis that the defendant would get something less than a life sentence if he testified truthfully against Miller.

Detective Larry Schroyer testified that according to a supplemental form in his file entered on January 30, 1997, the interviews with the defendant were set up by Mr. Evans and Mr. Landis in an attempt to arrange a plea agreement. He said he believed that the defendant had previously approached Detective Russell and had wanted to come forward and provide information against Miller in exchange for a plea. He said that no discussion regarding a plea offer occurred during the interviews. He said that the defendant was given *Miranda* warnings before both interviews, during which he was informed that his statement could be used against him.

Edward Landis testified that he approached Mr. Evans on January 7, 1997, to discuss a plea agreement. He said that his notes from that date reflect a tentative offer of second degree murder. He said that his notes reflected discussing a January 22 settlement conference with a more firm offer. He testified that on January 22, he and Mr. Evans discussed a maximum twenty-year sentence and the dismissal of the attempted first degree murder charge. He said he left the discussion with the understanding that Mr. Evans was going to get approval of the plea agreement from Mr. Calloway's family, that they would set up a time for the defendant to give a statement, and that they would proceed toward settlement. He said he believed that the defendant was to plead guilty to second degree murder with exposure to a maximum sentence of twenty years.

Mr. Landis testified that he conveyed the offer to the defendant on January 7 and told him that it was tentative. He said that the defendant seemed hesitant but ultimately agreed to give a statement to the police.

Mr. Landis testified that on January 28, he and the defendant met with the detectives and Mr. Evans. He said that the defendant was being evasive and that Mr. Evans became angry and left the room. He said that he requested to end the interview because it was a waste of time. He said he believed that the defendant was fulfilling part of the plea agreement by giving a statement to the police and that otherwise, he would not have let the defendant give a statement. Mr. Landis said that he met with the defendant on February 3 and told the defendant either to "tell it or be quiet." He said he thought the defendant's statements were part of the plea agreement in that they were part of the defendant's preparing to testify against Miller. Mr. Landis said that he did not explain to the defendant what would happen to the statement if he did not plead guilty.

The trial court denied the defendant's motion to suppress, finding that the statements were not made during the course of plea negotiations. It found that "the D.A. would not even discuss it with [the defendant] . . . unless he could do so preliminarily to see if there's any reason for negotiation. In other words, until he knows that [the defendant] is not just blowing smoke, he's not going to enter into any negotiation."

The defendant contends that his statement should have been suppressed pursuant to Rule 410, Tenn. R. Evid, and Rule 11, Tenn. R.Crim. P. Rule 410 provides, in pertinent part, as follows:

Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the party who made the plea or was a participant in the plea discussions:

. . . .

(4) Any statement made in the course of plea discussions with an attorney for the prosecuting authority which . . . result[s] in a plea of guilty later withdrawn.

Rule 11(e)(6), Tenn. R.Crim. P., parallels Rule 410 and provides that "evidence of a plea of guilty, later withdrawn . . . or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer."

▮ The rules do not encompass statements made during the preliminary investigation process. *See State v. James Wayne Butler*, No. 01C01–9301–CR–00023, Davidson County, slip op. at 6–7 (Tenn. Crim.App. Sept. 9, 1993). In *Butler*, the court determined that statements made by a defendant before he had been charged with a criminal offense were not encompassed by the rule. *See also*, Neil P. Cohen, et al., *Tennessee Law of Evidence*, § 410.5, at 229 (3d ed. 1995) ("To be excluded, the statements or conduct must have been given as part of plea negotiations rather than during the preliminary investigation process. For example, if a prosecutor participates in a custodial interrogation at a police station and the accused confesses during the questioning, Rule 410 would probably not bar the confession.").

Federal courts have considered what constitutes plea negotiations or discussions for purposes of Rules 410 and 11(e)(6). The Tennessee rules are identical to the federal rules by design. *See* Tenn. R.Crim. P. 11 Advisory Comm'n Comments. When the source of our rule is the

federal rule, federal developments are instructive. *See State v. Hicks,* 618 S.W.2d 510, 514 (Tenn.Crim.App.1981). In *United States v. Robertson,* 582 F.2d 1356, 1365 (5th Cir.1978), the court stated that "not every discussion between an accused and agents for the government is a plea negotiation," concluding that courts must consider the totality of the circumstances and determine whether the defendant exhibited an actual subjective expectation to negotiate a plea at the time of the discussion and whether the expectation was reasonable. *Id.* at 1366. Other courts have applied this standard. *See United States v. Grant,* 622 F.2d 308, 312 (8th Cir.1980); *United States v. O'Brien,* 618 F.2d 1234, 1240–41 (7th Cir.1980); *United States v. Pantohan,* 602 F.2d 855, 857 (9th Cir. 1979).

■ In the present case, the record shows that early on, the defendant expressed interest in negotiating a plea. The defendant contacted law enforcement officials to attempt to speak with the state regarding a plea agreement. Mr. Landis testified that he first spoke with the prosecutor regarding the possibility of a plea agreement on January 7, well before the defendant gave his statement on February 4. Further discussions about the possibility of a plea occurred, and as a result of those discussions, Mr. Landis believed that the defendant would receive a maximum twenty-year sentence if he gave a statement and testified truthfully against Miller. Mr. Landis said he told the defendant on January 7 of a tentative plea offered by the state. Detective Schroyer testified that his supplemental form reflected that the interviews with the defendant were arranged by the prosecutor and Mr. Landis "in an attempt to arrange a plea agreement."

The state contends that the statement was not given during the course of plea negotiations because a formal plea offer had not been made. It argues that all discussions that occurred until the state made its formal offer after the defendant gave his statement were simply preliminary and not part of plea negotiations. We disagree. The state takes too narrow a view of "plea negotiations." Rule 410 was enacted to encourage plea bargaining, "reducing the risks of engaging in plea bargaining by eliminating some of the costs of entering plea negotiations." Cohen et al., § 410.1 at 225. In addition, the rule "recognizes the unfairness inherent in permitting the government to engage in plea bargaining for the purpose of generating evidence to be used later at trial." *Id.* Were the state's proposal accepted, this would frustrate both the defendant and the state. The state would obviously not want to make a formal offer until learning what information a defendant possessed. However, defendants would not want to share this information with the state without some assurance that they might receive a reduced sentence and that the statements they made would not be held against them. As a practical matter, plea discussions and negotiations must take place before an offer or agreement is formalized; otherwise, neither party has an incentive to enter into a formal agreement. We hold that in the present case, the defendant's statement was made during the course of plea negotiations or discussions.

■ We must now determine whether the statement was made in the course of plea discussions "with an attorney for the prosecuting authority." Tenn. R. Evid. 410(4).[1] In *Butler,* this court determined

---

1. We note that Rule 11(e)(6), Tenn. R.Crim. P. is not limited to statements made to prosecut- ing attorneys.

that the defendant's statements did not fall within the purview of Rule 410 because they were made to a police officer and not a prosecuting authority before the defendant had been charged. Slip op. at 6. We agree with this general rule. However, we hold that when a law enforcement officer acts under the express authorization of the prosecuting attorney, statements made by a defendant to the officer are to be viewed as if they had been made directly to a prosecuting attorney.

In *United States v. Grant*, 622 F.2d 308, 313 (5th Cir.1980), the court considered the admissibility of a defendant's statements made to an FBI Agent. The interrogating agent, authorized by the U.S. Attorney, told the defendant that the U.S. Attorney would let him plead guilty to a one-count indictment if the defendant cooperated. The court determined that although the exclusionary provision of Rule 410 generally requires the statement to be made to a prosecuting attorney, an exception exists "in circumstances where the law enforcement official is acting with express authority from a government agency. Without such an exception, government attorneys might attempt to avoid the operation of the rules by authorizing law enforcement officials to conduct plea negotiations." *Id.; see also United States v. Serna*, 799 F.2d 842, 848 (2d Cir.1986) ("the rule can be fairly read to require the participation of a Government attorney in the plea discussions, but not necessarily his physical presence when a particular statement is made to agents whom the attorney has authorized to engage in plea discussions"), *overruled on other grounds*, *United States v. DiNapoli*, 8 F.3d 909, 914 (2d Cir.1993); *see generally* Cohen, et al., § 410.5 at 228 ("[I]f the prosecuting attorney utilizes others as the prosecutor's representative during plea negotiations, Rule 410 would extend its exclusionary rule to statements made to these people.").

In the present case, the evidence shows that the meeting at which the defendant's statement was taken was arranged at the behest of the prosecutor. Mr. Evans attended the first interview but did not attend the second interview, during which a statement was given, because of illness. Under these circumstances, Detective Schroyer acted as the prosecutor's agent, with his express authority. Thus, the statement can be said to have been given during plea discussions with an attorney for the prosecuting authority.

The state contends that even if the defendant's statement falls within the purview of the rules, the statement is nevertheless admissible because the defendant waived his rights by giving the statement after being told that it could be used against him. The state cites *United States v. Mezzanatto*, 513 U.S. 196, 115 S.Ct. 797, 130 L.Ed.2d 697 (1995), in which Mezzanatto met with the prosecutor to discuss the possibility of cooperating with the government. At the beginning of the meeting, the prosecutor informed Mezzanatto that before any discussions could occur, he would have to agree that any statements made during the meeting could be used to impeach any contradictory testimony he might give later. Mezzanatto conferred with his attorney and agreed to the prosecutor's terms. When a plea agreement did not materialize, the state used his statements to impeach him at trial. *Id.*, 513 U.S. at 199, 115 S.Ct. at 801.

Mezzanatto argued that the statements were inadmissible pursuant to Rules 410 and 11(e)(6). The Court determined that the rights guaranteed by Rules 410 and 11(e)(6) were presumptively waivable, stating that "there is no basis for concluding that waiver will interfere with the Rules' goal of encouraging plea bargaining." *Id.*, 513 U.S. at 207, 115 S.Ct. at 804. The

Court held that "absent some affirmative indication that the agreement was entered into unknowingly or involuntarily, an agreement to waive the exclusionary provisions of the plea-statement Rules is valid and enforceable." *Id.*, 513 U.S. at 210, 115 S.Ct. at 806. The Court determined that Mezzanatto "conferred with his lawyer after the prosecutor proposed waiver as a condition of proceeding with the plea discussion, and he has never complained that he entered into the waiver agreement at issue unknowingly or involuntarily." *Id.*, 513 U.S. at 211, 115 S.Ct. at 806.

Subsequently, courts in other jurisdictions have upheld defendants' knowing and voluntary agreements to waive the protections of Rules 410 and 11(e)(6). *See U.S. v. Krilich*, 159 F.3d 1020, 1026 (7th Cir. 1998) (upholding a waiver in which the defendant agreed that if he testified inconsistently or contradictory to his proffer, the state could use the proffer at trial for impeachment); *United States v. Burch*, 156 F.3d 1315, 1323 (D.C.Cir.1998) (holding that the defendant's waiver was knowing when he agreed to waive his specific rights pursuant to Rule 410 and 11(e)(6) as part of the formal plea agreement, and the record showed that the trial court went through the specific terms of the defendant's plea agreement, including the provision in which he waived his rights under Rules 11(e)(6) and 410). However, these cases involve the defendants' waiver of the specific protections provided by Rules 410 and 11(e)(6) with no indications that the waivers were involuntary or unknowing.

 In the present case, however, we believe that the record affirmatively indicates that the defendant did not knowingly waive the specific rights afforded by Rules 410 and 11(e)(6). Tennessee courts have determined what constitutes a knowing waiver in the context of other rights, such as the waiver of the right to trial and the waiver of the right against self-incrimination. *See State v. Mackey*, 553 S.W.2d 337, 340 (Tenn.1977); *State v. Stephenson*, 878 S.W.2d 530, 544–45 (Tenn.1994). A "knowing" waiver is one that is "made with full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (citing *Fare v. Michael C.*, 442 U.S. 707, 99 S.Ct. 2560, 61 L.Ed.2d 197 (1979); *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)). This standard for a knowing waiver has been applied, as well, to the waiver of the statute of limitations. *See State v. Pearson*, 858 S.W.2d 879, 887 (Tenn.1993). In that case, our supreme court determined that defendants can waive the statute of limitations but that the waiver must be knowing and voluntary. *Id.* The court determined that no evidence existed in the record to indicate that the defendant's waiver was knowing and voluntary, stating that "there was no discussion at all of the expiration of the statute of limitations in the trial court." *Id.* It held that "[a] waiver ... will not be presumed where there is no evidence ... to indicate that the appellant was made aware of the issue." *Id.; see also United States v. Young*, 73 F.Supp.2d 1014, 1024 (N.D.Iowa 1999) (holding that the defendant, who was informed only that his statement could be used against him if he backed out of the plea agreement, did not knowingly waive his rights pursuant to Rules 410 and 11(e)(6) because he was not "advised of the existence of a right not to have plea statements used in a subsequent trial or other proceeding."). *Id.* at 1024.

 In the present case, the evidence shows that the detectives administered standard *Miranda* warnings, informing the defendant that he had a right to remain silent and that anything he said could be used against him in court. The state contends that the defendant's waiver of his

*Miranda* rights also constituted a knowing waiver of the protections of Rules 410 and 11(e)(6). We disagree. *Miranda* warnings sufficiently apprise defendants of their Fifth Amendment right to remain silent. In addition, the United States Supreme Court has held that *Miranda* warnings sufficiently inform defendants of their Sixth Amendment right to counsel such that a subsequent waiver is knowing. *Patterson v. Illinois,* 487 U.S. 285, 293–94, 108 S.Ct. 2389, 2395, 101 L.Ed.2d 261 (1988). The Court determined that by "telling [Patterson] that he had a right to consult with an attorney, to have a lawyer present while he was questioned, and even to have a lawyer appointed for him if he could not afford to retain one on his own, [this] conveyed to [Patterson] the sum and substance of the rights that the Sixth Amendment provided him" such that his subsequent waiver was knowing. *Id.* *Miranda* warnings specifically inform defendants that they have the right to remain silent and the right to have an attorney present. Thus, *Miranda* warnings serve to make defendants aware of those specific rights. However, *Miranda* warnings do not mention the rights provided by Rules 410 and 11(e)(6). Thus, the warnings cannot make a defendant fully aware of the nature of the rights provided by Rules 410 and 11(e)(6) such that a waiver of *Miranda* rights is also a knowing waiver of the rights provided by the rules. *See generally Roberts v. Commonwealth,* 896 S.W.2d 4, 7 (Ky.1995) (though not discussing waiver, the court held that statements made by a defendant during plea discussions were inadmissible pursuant to Kent. R. Evid. 410, and the defendant had been advised only of his *Miranda* rights prior to discussions); *Barnett v. State,* 725 So.2d 797, 801 (Miss.1998) (though not addressing waiver, the court held that Rule 410 prohibited the use of the defendant's statements made during plea discussions after the defendant had been given *Miranda* warnings).

We note that the supreme court of Michigan recently reached a different conclusion in dictum. *See People v. Stevens,* 610 N.W.2d 885 (Mich. 2000). In that case, Stephens made statements during plea negotiations after being warned that any statements he made could be used against him. The statements were subsequently used against him at trial. The Michigan Supreme Court held that the issue need not be addressed because it was not raised, however, it stated that proceeding to answer questions after being given *Miranda* warnings constitutes a "voluntary waiver of any legal right to prevent the answers from being used in a subsequent trial regardless of defendant's subjective knowledge of the content" of Rule 410. Judge Kelly, joined by Judge Cavanaugh, dissented and stated as follows:

> Contrary to the majority, I find the warning insufficient to support a knowing and voluntary waiver of defendant's MRE 410 protections and the use of his statements as evidence.
>
> Something more than a *Miranda* warning is necessary for a court to find that a defendant waived his right to exclude from evidence statements made during plea negotiations. A waiver must be supported by a showing that the accused was aware of the rights being relinquished and the consequences that could result from relinquishing them.
>
> . . . .
>
> Defendant was not specifically advised of the protections offered by MRE 410. He was not expressly advised that, by entering into plea negotiations, he would waive those protections. Therefore, . . . I find that defendant's waiver was made involuntarily. An involuntary waiver

renders statements obtained pursuant to it inadmissible.

*Id.* at 890-91 (citations omitted).

 We believe that the statement in the majority opinion in *Stephenson* is contradictory to Tennessee law, which requires that the defendant be aware of the nature of the right being abandoned before a knowing waiver can occur. *See Stephenson,* 878 S.W.2d at 545; *Pearson,* 858 S.W.2d at 887. In Tennessee, a defendant's subjective knowledge of the content of the right being waived is crucial, not irrelevant, for determining whether a waiver is knowing. We do not believe that *Miranda* warnings, which do not mention the rights provided by Rules 410 and 11(e)(6), can make a defendant aware of the nature of those rights. Furthermore, the purposes and protections of *Miranda* are substantially different from the purposes and protections of Rules 410 and 11(e)(6). The purpose of *Miranda* warnings is to secure the privilege against self-incrimination, ensuring that confessions are voluntary and intelligent. *See Stephenson,* 878 S.W.2d at 547. The purpose of the protections of Rules 410 and 11(e)(6), on the other hand, is to foster frank and open discussions that lead to plea agreements. *See* Cohen, et al., § 410.1 at 224 ("Rule 410 ... is designed to encourage out-of-court settlements by reducing the possible adverse consequences of participating in negotiations."). Perhaps if the rights protected by and the purposes of *Miranda* and the plea-statement rules were the same, such that an explanation of one right would serve to explain the nature of the other, a warning and waiver of one would serve as a warning and waiver of the other. However, such is not the case.

 We hold that the administration of *Miranda* warnings is insufficient to inform the defendant of his rights pursu-

ant to Rules 410 and 11(e)(6). Because the defendant in the present case was given *Miranda* warnings and nothing more, the record affirmatively indicates that the defendant did not knowingly waive his rights pursuant to the plea-statement rules.

 Furthermore, we cannot say that the error was harmless. The crux of the state's case consisted of the defendant's statement. Without the statement, the remaining evidence consists of the testimony of Mr. Cripps that the defendant canvassed the store and bought a small bottle of liquor before another man entered; the testimony of the officers who found the defendant in the gravel lot; and the testimony of JoHanna Skelton that the defendant stated that he and Miller shot somebody. With this scant evidence remaining, we believe that the error more probably than not affected the verdict. *See* Tenn. R.Crim. P. 52(a); T.R.A.P. 36(b). Thus, the defendant's convictions are reversed, and the case is remanded to the trial court. Although our resolution of this issue determines the outcome of this case, we will briefly address the merits of the defendant's remaining issues.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

The defendant contends that his attorney was ineffective for allowing him to give a statement to police without ensuring that the statement was being made pursuant to plea negotiations and, thus, inadmissible. Having found that the statement was made pursuant to plea negotiations and is inadmissible, the issue is without merit.

## IV. CONTINUANCE

 The defendant contends that the trial court erred by failing to grant a continuance when the state failed to provide proper notice of its intent to seek en-

hanced punishment. He argues that the state's motion was filed one day before trial and that Tenn.Code Ann. § 40–35–202(a) requires such motions to be filed ten days before trial. Thus, he argues that he should have been granted a continuance. *See* Tenn. R.Crim. P. 12.3(a) ("If the notice is filed later than [10 days before trial], the trial judge shall grant the defendant, upon motion, a reasonable continuance of the trial."). The record shows that the day before trial, the state filed a "Notice to Enhance or Impeach," stating its intent to use the defendant's previous convictions. The defendant moved for a continuance pursuant to Rule 12.3(a), Tenn. R.Crim. P. However, the prosecutor stated that it intended to use the defendant's convictions only for impeachment and not for sentence enhancement. Thus, the trial court struck the portion of the state's motion related to sentence enhancement. The issue is without merit.

## V. ADMISSIBILITY OF THE 9–1–1 TAPE

■ The defendant contends that the trial court erred by allowing the state to introduce into evidence the tape of Mr. Cripps's call to 9–1–1 because it was not properly authenticated. He argues that the state failed to identify the voices on the tape pursuant to Rule 901, Tenn. R. Evid., and relies upon *State v. Julius E. Parker*, No. 02C01–9606–CR–00188, Shelby County (Tenn.Crim.App. Apr. 23, 1997). In that case, the state introduced the tape of a 9–1–1 call into evidence through the supervisor and custodian of the 9–1–1 records, who explained the procedures by which records of incoming calls were retained. *Parker*, slip op. at 9. A panel of this court determined that the testimony did not sufficiently authenticate the content of the recording and held that the voices on the 9–1–1 tape must be identified " 'by opinion based upon hearing the voice at any time

under circumstances connecting it with the alleged speaker.' " *Id.* (quoting Tenn. R. Evid. 901(b)(5)).

We agree that this is one method by which the content of 9–1–1 tapes may be authenticated. Rule 901(b)(5), Tenn. R. Evid., provides for such voice identification. However, the rule also states that this is an example, "[b]y way of illustration only, and not by way of limitation," of the types of authentication or identification which conform with the rule. The rule provides that the "requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter is what its proponent claims." Tenn. R. Evid. 901(a). Once this foundation is presented, the "trier of fact then makes the ultimate decision of whether the item is actually what it purports to be." Cohen et al., § 901.1 at 613.

In the present case, Johnny Haynes testified that he was the custodian of the 9–1–1 tape involving the victims on September 27, 1995. Mr. Haynes explained the process by which the 9–1–1 tapes are processed and retrieved. The tape was played for the jury, and at the beginning of the tape, Mr. Haynes states that the "following is a recording of a call from the Kwik–E Mart located at 4409 Rossville Boulevard on the 27[th] of September 1995 ... at 2302 hours and 40 seconds." We believe that this evidence is sufficient for the trial court to determine that the jury could find that the tape was of the 9–1–1 call made by Mr. Cripps after the shootings in this case. The jury was then free to determine whether the tape was, in fact, of the 9–1–1 call involved in this case.

## VI. CLOSING ARGUMENT

The defendant contends that the trial court erred by failing to grant a mistrial

when the prosecutor made prejudicial comments during opening statement and closing argument. The record shows that during opening statement, the prosecutor said, "Christopher Calloway's six-year-old daughter doesn't have a father." The defendant's attorney objected, and the trial court instructed the jury that it could not let sympathy enter into its decision. During closing argument, the prosecutor stated that but for the defendant's actions, "[w]e would not have this fatherless child." Again, the defendant's attorney objected, and the trial court instructed the jurors to disregard the statement. In its charge to the jury, the trial court instructed that the jury could "have no prejudice or sympathy or allow anything but the law and evidence to have any influence on your verdict."

 The prosecutor's remarks were improper. Attorneys should not make appeals to the jury based upon sympathy, prejudice or bias. *See State v. Cribbs,* 967 S.W.2d 773, 786 (Tenn.1998). Furthermore, we are concerned by the prosecutor's continuing to make the improper remarks during closing argument after an objection to the remarks was sustained during opening statement. However, considering the evidence presented and the trial court's instructions to the jury to disregard the statements and consider only the law and evidence in reaching its decision, we cannot say that the error "affected the verdict to the prejudice of the defendant." *Harrington v. State,* 215 Tenn. 338, 340, 385 S.W.2d 758, 759 (1965); *see Judge v. State,* 539 S.W.2d 340, 344 (Tenn.Crim.App.1976).

In consideration of the foregoing and the record as a whole, we reverse the convictions and remand the case to the trial court.