# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs November 6, 2007

## STATE OF TENNESSEE v. CHARLES VANTILBURG, III
**Appeal from the Criminal Court for Shelby County**
**No. 00-12715     Lee V. Coffee, Judge**

---

### No. W2006-02475-CCA-R3-CD  - Filed February 12, 2008

---

The defendant, Charles Vantilburg III, was originally convicted of second degree murder in 2002 and sentenced to 20 years' incarceration.  On direct appeal, this court reversed the defendant's conviction and remanded the case for a new trial on the basis of the trial court's giving an erroneous definition of the term "knowingly."  *See State v. Charles Vantilburg*, No. W2002-01480-CCA-R3-CD (Tenn. Crim. App., Jackson, Jan. 13, 2004).  After a second trial, the defendant was again convicted of second degree murder, and the trial court imposed a 22-year sentence.  In this appeal, the defendant asserts that (1) the evidence is insufficient to support his conviction, (2) the trial court erred by admitting into evidence a "memorandum of understanding" signed by the parties, (3) the trial court erred by permitting the state to play a videotape of the recovery of the victim's body, (4) the trial court erred by instructing the jury on flight, and (5) the sentence is excessive.  The sentence is modified to 20 years; otherwise, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed as Modified**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and J.C. MCLIN, JJ., joined.

Leslie I. Ballin, Memphis, Tennessee, for the appellant, Charles Vantilburg III.

Robert E. Cooper, Jr., Attorney General and Reporter; Jennifer L. Smith, Assistant Attorney General; and Thomas Henderson and Karen Cook, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

The defendant was convicted of second degree murder for the shooting homicide of the victim, Toby Gibson, in June 2000.  On June 22, 2000, the victim's mother, Terri Tibbs, tried to reach him by telephone but was unable to do so.  She later spoke to his roommate, who told her that the victim had not been home that day and had missed a softball game that evening.  The next day, Ms. Tibbs and the victim's girlfriend, Brandy Shannon, went to the Bartlett Fire Department, where both the victim and the defendant worked, and spoke to the defendant.  The defendant admitted to Ms. Tibbs that he was the last person known to have seen the victim.

Bartlett Assistant Fire Chief Terry Wiggins was cutting grass at a baseball field located across the road from the defendant's house on June 22, 2000, when he heard a gunshot at approximately 4:00 p.m. Mr. Wiggins stated that neither he nor his son, who was helping with the grass, was able so see any source for the gunshot. Later that same day, the victim failed to show up for a softball game, which was very unusual. When the victim also failed to arrive as scheduled for work the following morning, Mr. Wiggins spoke with other firefighters on the shift, including the defendant. The defendant volunteered that the victim had been at the defendant's house during the time that Mr. Wiggins and his son were cutting grass.

After learning that the defendant was the last person to see the victim alive, Bartlett Police Department Detective Kevin Thompson interviewed the defendant, who told him that the victim had come to his house to collect a debt. The defendant also claimed that the victim then went to Wolf Chase Mall to "buy some steroids from someone." The defendant told Detective Thompson that the victim had asked him to follow him to the mall "to be his backup." The defendant agreed and asked his friend Raoul Laguna to take him to the mall. According to the defendant, he went to the food court area, purchased a bottle of water, and when he did not see the victim, he telephoned Laguna to pick him up. Bartlett Fire Department Lieutenant Tracy Barnett confirmed that the victim told him that he was going to the defendant's house to collect a debt.

Raoul Laguna, who worked for the defendant renovating houses, confirmed that the defendant telephoned him and asked him to pick him up at Wolf Chase Mall on June 22, 2000. Several days later, the defendant again telephoned Mr. Laguna and asked him to give him a ride from Mr. Laguna's mother's house. When Mr. Laguna arrived at his mother's house, he noticed the work van that the defendant used in his renovating work parked in the driveway. Later, Mr. Laguna noticed a foul odor emanating from the van and flies swarming around the back of it. When the defendant came to retrieve the van, Mr. Laguna attempted to follow him but eventually lost sight of him.

During a search of the defendant's residence and property, Shelby County Sheriff's Department Reserve Deputy Barney Gardner discovered a shell casing and an area of discoloration on the floor of a "tractor garage." Other officers located the defendant's work van in the parking lot of Advance Auto Parts, "cut off the padlocks on the back[,] and opened the doors." According to Memphis Police Officer Shan Tracy, the inside of the van "smelled like something was dead" and was covered in swarming flies. Officer Tracy also observed "some paint tarps on the floor [of the van], and . . . a liquid substance that was drying. We felt it was probably blood." Bartlett Police Lieutenant Doug Bailey confirmed that "[u]pon stepping onto the parking lot you could smell a very foul stench around the van." Lieutenant Bailey stated that there were "dark reddish stains" on a white tarp and "on the floor of the interior of the van."

On June 25, 2000, the defendant turned himself in to the Bartlett Police Department. Two days later, the defendant, in the presence of his attorney, agreed to give a statement to police. Lieutenant Bailey read into evidence a "memorandum of understanding" signed by the parties wherein the defendant agreed to reveal the location of the victim's body in exchange for the State's promise not to prosecute him for any crime more serious than second degree murder. In his

statement to police, the defendant claimed that the victim became enraged when the defendant was unable to pay him the entire amount of money he owed. According to the defendant, he gave the victim $100 and offered to go to the bank for more money, but the victim was not satisfied with his efforts. The defendant claimed that the victim pushed him "pretty hard," causing him to "step back a couple of steps." At that point he reached for his gun and said, "Now, Toby, just, you know, stop. That's enough. I'll get your money." The defendant stated that he "wasn't going to shoot him" but the victim pushed him and then turned around and that "the gun went off." He recalled that the victim "fell up against the side of the wall and it's like he fell straight down." Of his next actions, the defendant said:

> I mean it was just crazy. . . . I mean, hell he's my friend. You know? . . . . I go out of the barn and I look towards my house and I see my son looking through the window at the patio door and the two dogs and I still ain't found my daughter. Anyway, so I, I don't know what to do. . . . I know now I should of called and reported it, but I just saw everything I had just going away, but I went in my little storage building and got a tarp out that was in there. It was a blue tarp and uh, there's a big fuzzy rug thing that we used to keep on our bed that my daughter camped out in the backyard . . . and she had used it as a . . . mattress underneath her sleeping bag. Anyway, that was out there on the back patio and it was all nasty. . . . I got that and I got the tarp and I went back over and still I didn't call. . . . I wrapped him up and I . . . tried to get some of the blood that was on the ground. . . . I told [my daughter and my son] to stay in the house. . . . I made a couple of phone calls then. . . . There was a glove [on the kitchen counter] and I got the glove and I got a uh, dish towel that was on the counter. I'm sweating pretty good. I'm getting nauseated. I can't think. . . . I couldn't think of what to do then and so anyway, I got in his vehicle and I drove out through Ellendale . . . . I called a guy that works for me, Ra[o]ul, and . . . . I told him . . . I needed him to come pick me up. . . . So he said, "OK, Chief." . . . . I drive over to Wolfchase. . . . I parked the truck and I got out and I wiped the sweat . . . and tears, I don't know which, off the . . . st[ee]ring wheel and the seat. . . . I went to the Food Court . . . . I bought a bottle of water and uh, downed it. . . . Ra[o]ul pulled up in his green van and I got in and uh, he said, "What's going on?" I said, "Nothing, You don't want to know.". . . We get back to the house and I still got a problem. My good friend's dead. I killed him. I didn't mean to. . . . [B]ut he's dead and he's in the backyard and I got rid of the truck, but I still got his body.

The defendant stated that he then put his children into his vehicle and drove them to Sonic to get something to eat. From there, the defendant made two stops looking for peroxide to clean up the blood in the shed. When he returned to his house, he sent the children inside with the

food, and after making an excuse about servicing one of his rental houses, the defendant got in his yellow van and drove toward the shed. He stated that he believed it was "too late" to report the crime, and instead chose to place the victim's body in the van. He then drove the van to the house shared by Mr. Laguna's sister and mother and locked it inside a fence behind the house. He returned home and went to work the following morning.

Two days later, Mr. Laguna called and asked the defendant to come and get the van because "[t]here's [sic] flies and the van stinks." The defendant went to pick up the van and made the decision "to dump" the victim. He then drove to a rural area and "dropped" the victim's body on the side of the road. After leaving the van in a parking lot and borrowing $20 from Mr. Laguna, the defendant drove around "all that night and the next morning and half the day" before deciding to turn himself in. At the conclusion of the interview, the defendant added, "I know y'all are charging me with murder, but it wasn't murder. I can't even say I think, . . . hell, it wasn't even self-defense. It was an accident . . . ."

Tennessee Bureau of Investigation Firearms Examiner Steve Scott tested the Glock 9 mm belonging to the defendant and found the handgun to be "in proper working order." Agent Scott testified that the weapon had three properly functioning safeties and seven pounds of trigger pull. Agent Scott explained that a "hair trigger" refers to a weapon with one pound or less of trigger pull. Agent Scott confirmed that the shell casing found in the defendant's shed had been fired from the Glock 9 mm.

Shelby County Medical Examiner Doctor O'Brian Cleary Smith was present during the recovery of the victim's body, which was "wrapped in [a] sheepskin blanket in blue tarp [and] tied with multiple wraps," resting at the bottom of a steep culvert in rural Desoto County, Mississippi. The victim suffered a single gunshot wound to the back of the neck, just to the right of the midline. "The bullet went through the skin and the subcutaneous tissues underneath. It fractured the right lateral or right side of the first cervical vertebra with intrusion of the bone fragments into the spinal canal and laceration of the spinal cord." According to Doctor Smith, the gunshot would have been "sufficient to cause instantaneous incapacitation which means the person would be unconscious, paralyzed, and it would just then be a matter of minutes before the brain died and then the organs like the heart and such would follow." During cross-examination, Doctor Smith acknowledged that the defendant's description of the shooting as accidental "would be consistent with the anatomic findings that were present at autopsy" but clarified that an intentional gunshot would also be consistent with his findings. Doctor Smith also observed that even immediate medical intervention would not have saved the victim's life.

Randall Eugene Alberson, Sr., a driver with the Bartlett Fire Department, testified that after learning that the defendant had been arrested for the victim's murder, he went to the jail to visit the defendant and "to hear . . . what really happened."[1] Mr. Alberson recalled that the defendant "cried for most of the time he was talking" and gave a description of the events

---

[1]Because Mr. Alberson was medically unavailable to testify at the defendant's second trial, the transcript of the testimony he provided at the first trial was read into evidence.

surrounding the victim's death that was nearly identical to that he had provided to police. According to Mr. Alberson, the defendant told him "point blank," "Yes, I meant to shoot [the victim], but I didn't mean to kill him. I loved him like a brother."

At the conclusion of the trial, the jury convicted the defendant of second degree murder. Later, the trial court imposed a 22-year sentence. In this appeal, the defendant challenges the sufficiency of the evidence, the admission of certain evidence, the propriety of the jury instruction on flight, and the length of the sentence.

## I. Sufficiency of the Evidence

The defendant asserts that the evidence is insufficient to support his conviction. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). The rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *Winters*, 137 S.W.3d at 654.

In determining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact. *Id.* at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

Second degree murder is the "knowing killing of another." T.C.A. § 39-13-210(a)(1) (1997). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b) (1997).

In this case, the evidence established that the victim was killed by a single gunshot wound to the back of the neck that caused instantaneous incapacitation, followed shortly by brain death and systemwide organ failure. Although the defendant claimed that the shooting was an accident, he did not call to report it to the authorities. Instead, he wrapped the victim's body and hid it in a van. Over the ensuing days, the defendant took great pains to hide the victim's body and deflect suspicion from himself. He admitted lying to police and to the victim's family about his meeting with the victim. Moreover, the defendant admitted to Mr. Alberson that, although he had not meant to kill the victim, he had intended to shoot him during their altercation. The jury, as was its prerogative, rejected the defendant's theory of the shooting and found that he knowingly killed the victim. The evidence adduced at trial fully supports that verdict.

## II. Admission of Evidence

-5-

The questions presented by this defendant concerning the admissibility of evidence rest within the sound discretion of the trial court and this court will not interfere with the exercise of this discretion in the absence of a clear abuse appearing on the face of the record. *See State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. Van Tran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992). An abuse of discretion occurs when the trial court applies an incorrect legal standard or reaches a conclusion that is "illogical or unreasonable and causes an injustice to the party complaining." *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006) (citing *Howell v. State*, 185 S.W.3d 319, 337 (Tenn. 2006)); *see also State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999).

### A. "Memorandum of Understanding"

The defendant contends that the "memorandum of understanding" should not have been admitted into evidence because it was irrelevant and because "it occurred during a Charge Agreement."

Relevant evidence is evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. "All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules, or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible." *Id*. at 402. However, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id*. at 403.

Here, the trial court indicated that it would defer to the ruling of the trial court in the defendant's first trial because the defendant had not offered any new reason that the evidence should be excluded.[2] That court ruled that the memorandum of understanding was relevant and admissible. On direct appeal from the first trial, this court ruled that "[t]he statement was relevant to show that the defendant did not divulge the location of the body and weapon out of remorse. It was relevant to let the jury know that his motives were not purely altruistic." The State asserts that we are bound by the "law of the case" doctrine to adhere to this previous ruling. We agree.

Our supreme court addressed the "law of the case" doctrine in great detail in *Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303 (Tenn. 1998):

> The phrase "law of the case" refers to a legal doctrine which generally prohibits reconsideration of issues that have already been decided in a prior appeal of the same case. In other words,

---

[2]The trial judge from the defendant's first trial had retired at the time of the second trial.

under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal. The doctrine applies to issues that were actually before the appellate court in the first appeal and to issues that were necessarily decided by implication. The doctrine does not apply to dicta.

The law of the case doctrine is not a constitutional mandate nor a limitation on the power of a court. Rather, it is a longstanding discretionary rule of judicial practice which is based on the common sense recognition that issues previously litigated and decided by a court of competent jurisdiction ordinarily need not be revisited. This rule promotes the finality and efficiency of the judicial process, avoids indefinite relitigation of the same issue, fosters consistent results in the same litigation, and assures the obedience of lower courts to the decisions of appellate courts.

Therefore, when an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand. There are limited circumstances which may justify reconsideration of an issue which was issue decided in a prior appeal: (1) the evidence offered at a trial or hearing after remand was substantially different from the evidence in the initial proceeding; (2) the prior ruling was clearly erroneous and would result in a manifest injustice if allowed to stand; or (3) the prior decision is contrary to a change in the controlling law which has occurred between the first and second appeal.

*Id.* at 306. In this case, none of the three exceptions to the doctrine are applicable. The evidence offered at the defendant's second trial was nearly identical to that offered at the first, the prior ruling was not "clearly erroneous," and there has been no change in the controlling law. In consequence, the law of the case doctrine requires that we adhere to our previous ruling that the memorandum of understanding was relevant and admissible.

As to the defendant's contention that the memorandum of understanding was inadmissible because it was part of a "charge agreement," we agree with the State that the memorandum was not governed by the provisions for the admissibility of statements made during plea negotiations. At the time he entered into the memorandum of understanding, the defendant had not yet been charged with any crime. Accordingly, the protections offered by Tennessee Rule of Evidence 410 and Tennessee Rule of Criminal Procedure 11(6)(e), providing that statements made during plea negotiations are not admissible, are not available to the defendant. *See State v. Butler*,

42 S.W.3d 113, 121 (Tenn. 2000) (holding that statements made by a defendant before he is charged are not governed by the rules regarding plea negotiations). Moreover, there was no evidence that the defendant "exhibited an actual subjective expectation to negotiate a plea at the time of the discussion and whether the expectation was reasonable." *See id.* at 122 (citing *United States v. Robertson*, 582 F.2d 1356, 1366 (5th Cir. 1978)). Thus, the defendant is not entitled to relief on this issue.

### B. Videotape of Recovery of Victim's Body

The defendant also contends that the trial court erred by permitting a videotape recording of the recovery of the victim's body to be shown to the jury because the evidence was more prejudicial than probative. The State asserts that the "recovery video" was "highly probative" because it "showed the lengths to which [the defendant] resorted to conceal" the victim's body.

"The admissibility of authentic, relevant videotapes of the crime scene or victim is within the sound discretion of the trial judge, and his ruling on the admissibility of such evidence will not be overturned without a clear showing of abuse of discretion." *Van Tran*, 864 S.W.2d at 477 (citing *State v. Teague*, 645 S.W.2d 392, 397 (Tenn. 1983)). Where the probative value of photographic evidence outweighs the danger for unfair prejudice, the evidence is admissible if relevant. *State v. Banks*, 564 S.W.2d 947, 949 (Tenn. 1978); *State v. Braden*, 867 S.W.2d 750, 758 (Tenn. Crim. App. 1993).

Here, the videotape was relevant to show the manner in which the defendant had disposed of the victim's body and documents the defendant's efforts at concealing the crime. Moreover, the videotape, although certainly unpleasant, is neither gruesome nor inflammatory. We cannot say that its probative value is outweighed by the danger of unfair prejudice. The defendant is not entitled to relief on this issue.

### III. Jury Instruction on Flight

The defendant contends that the trial court erred by instructing the jury on flight and the inference of guilt that may be justified from such flight. He contends that the instruction lowered the State's standard of proof because it allowed the jury to infer guilt from flight. The State argues that the instruction was proper.

The trial court has a duty "to give a complete charge of the law applicable to the facts of a case." *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986); *see* Tenn. R. Crim. P. 30. To properly charge the jury on flight as an inference of guilt, there must be sufficient evidence to support such instruction. *State v. Berry*, 141 S.W.3d 549, 588 (Tenn. 2004). Sufficient evidence supporting such instruction requires "'both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community.'" *State v. Payton*, 782 S.W.2d 490, 498 (Tenn. Crim. App. 1989) (quoting *Rogers v. State*, 455 S.W.2d 182, 187 (Tenn. Crim. App. 1970) (citing 22A C.J.S. Criminal Law § 625))). Our supreme court has held that "[a] flight instruction

is not prohibited when there are multiple motives for flight" and that "[a] defendant's specific intent for fleeing a scene is a jury question." *Berry*, 141 S.W.3d at 589.

The evidence in this case supports the giving of the flight instruction. The defendant dumped the victim's body into a culvert and then drove around for a day and a half by his own admission. We fail to see, and the defendant has not explained, how the flight instruction lowered the standard of proof. The single citation to *State v. Shepherd*, 862 S.W.2d 557, 567 (Tenn. Crim. App. 1992), provides little guidance as that case does not address the propriety of the flight instruction. The defendant is not entitled to relief on this issue.

### *IV. Sentencing*

As his final complaint, the defendant challenges the length of his sentence. When a defendant challenges the length of a sentence, this court generally conducts a de novo review of the record with a presumption that the determinations made by the trial court are correct. T.C.A. § 40-35-401(d) (2003). This presumption, however, is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The burden of showing that the sentence is improper is upon the appellant. *Id*. If the review reflects the trial court properly considered all relevant factors and its findings of fact are adequately supported by the record, this court must affirm the sentence, "even if we would have preferred a different result." *State v. Fletcher*, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). In the event the record fails to demonstrate the required consideration by the trial court, appellate review of the sentence is purely de novo. *Ashby*, 823 S.W.2d at 169.

In making its sentencing determination in the present case, the trial court, at the conclusion of the sentencing hearing, was obliged to determine the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and sentencing hearings, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant made in his behalf about sentencing, and (7) the potential for rehabilitation or treatment. T.C.A. §§ 40-35-210(a), (b); -103(5); *State v. Holland*, 860 S.W.2d 53, 60 (Tenn. Crim. App. 1993).

In arriving at the defendant's sentence of 22 years, the trial court observed that the State had indicated that no enhancement factors were applicable and did not, therefore, apply any of the statutory enhancement factors found in Tennessee Code Annotated section 40-35-114. The trial court did, however, find in mitigation that the murder was committed "under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct," *see* T.C.A. § 40-35-113(11), and that the defendant had no prior criminal history, *see id.* § 40-35-113(13). Nevertheless, relying exclusively on the "nature and characteristics of the criminal conduct involved," the trial court increased the sentence from the presumptive midpoint of 20 years to 22 years.

The trial court's decision to enhance the sentence by two years without applying any statutory enhancement factors was error. Although the trial court correctly observed that it was required to consider the nature and circumstances of the offense when setting the sentence, the version of the Sentencing Act governing the imposition of the sentence in this case provided that the sentence may only be increased upon a finding of one or more of the enhancement factors found in Tennessee Code Annotated section 40-35-114. *See* T.C.A. § 40-35-210 (1997). Specifically, the Act provided that "[s]hould there be mitigating but no enhancement factors for a Class A felony, then the court shall set the sentence at or below the midpoint of the range." *Id.* § 40-35-210(d). Because the trial court erred by increasing the sentence in the absence of enhancement factors, our review of the sentence is purely de novo with no presumption of correctness.

Before considering de novo the propriety of the 22-year sentence, we will consider the defendant's claim that the trial court's use of the pre-2005 version of the Sentencing Act violated the ex post facto provisions of the State and Federal Constitutions. As the State correctly points out, because the defendant was not sentenced pursuant to provisions enacted after he committed the murder, there are no ex post facto concerns. The defendant was properly sentenced under the version of the Sentencing Act in effect at the time of his crime. Had the defendant desired sentencing under the 2005 amendment to the Sentencing Act, he could have executed a waiver of his ex post facto protections. *See* T.C.A. § 40-35-114 (Supp. 2005), compiler's notes; *see also State v. Robert Lamont Moss, Jr.*, No. M2006-00890-CCA-R3-CD, slip op. at 5 n.1 (Tenn. Crim. App., Nashville, Dec. 4, 2007). No waiver appears in the record; thus, the sentence in this case was governed by the pre-2005 amendments.

Turning to the propriety of the length of the sentence, we remain mindful that the sentence imposed upon our de novo review must be compliant with the strictures imposed by *Blakely v. Washington*, 542 U.S. 296 (2004), *Cunningham v. California*, 549 U.S. ___, 127 S. Ct. 856 (2007), and *State v. Gomez*, ___ S.W.3d ___, No. M2002-01209-SC-R11-CD (Tenn., Oct. 9, 2007). The State contends that factors permitting enhancement on the basis of the defendant's use of a firearm to commit the offense, *see* T.C.A. § 40-35-114(9) (1997), and on the basis that the victim's body was treated with exceptional cruelty, *see id.* at (5), were admitted by the defendant and supported by the evidence.

Although a sentencing court may apply a statutory enhancement factor when the factual basis for doing so is admitted by the defendant, *see Blakely*, 542 U.S. at 303, the record in this case does not establish that the defendant made a judicial admission of the factual basis for either enhancement factor. The defendant did admit in his statement to police that he shot the victim with a 9 mm handgun. In our view, however, this extrajudicial statement does not satisfy the requirements of *Blakely*. Similarly, although the defendant acknowledged to police that he had wrapped the victim's body in blankets and tarp and stashed it in his work van before driving to a remote location and dumping it in a culvert, these statements were made outside the confines of any judicial proceeding and thus do not qualify as admissions for purposes of the Sixth Amendment.

Because the defendant had no prior convictions and because no other enhancement factors are applicable under a *Blakely-Cunningham* analysis, the defendant's sentence cannot be

enhanced past the presumptive sentence, which is the midpoint within the range. As indicated, the trial court applied two mitigating factors but did not give either great weight. We agree with the trial court that neither the defendant's lack of a criminal history nor the fact that the crime indicated no sustained intent to violate the law is sufficient to warrant a sentence below the midpoint sentence of 20 years. In consequence, we modify the sentence to 20 years.

## CONCLUSION

The evidence is sufficient to support the defendant's conviction for second degree murder. Because the trial court did not err in the admission of either the memorandum of understanding or the videotape of the recovery of the victim's body, the defendant is not entitled to relief on these evidentiary issues. The instruction on flight and the inference of guilt it provides was fully supported by the evidence and did not lessen the State's burden of proof. Finally, upon de novo review of the sentence, we find that the sentence must be modified to 20 years based upon the holdings in *Blakely* and its progeny. Otherwise, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR. JUDGE