IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 28, 2009 Session

**STATE OF TENNESSEE v. CRYSTAL MIRANDA KIRBY**

**Direct Appeal from the Criminal Court for Campbell County**
**No. 13267     E. Shayne Sexton, Judge**

_____

**No. E2008-01862-CCA-R3-CD - Filed May 7, 2010**
_____

A Campbell County Criminal Court Jury found the appellant, Crystal Miranda Kirby, guilty of the first degree premeditated murder, second degree murder, and especially aggravated robbery of Jonathan Pierce.  The trial court imposed concurrent sentences of life, twenty-one years, and eighteen years, respectively.  On appeal, the appellant challenges the trial court's pretrial ruling on the admissibility of a statement she made in the course of plea negotiations and the sufficiency of the evidence sustaining her conviction of first degree premeditated murder.  Upon review, we affirm the judgments of the trial court; however, we remand for an entry of a judgment reflecting that the conviction for second degree murder is merged into the conviction for first degree murder.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are
Affirmed in Part, Vacated in Part; Case Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Robert W. Scott and David M. Pollard, Jr., Jacksboro, Tennessee, for the appellant, Crystal Miranda Kirby.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William Paul Phillips, District Attorney General; and Michael O. Ripley and Scarlett W. Ellis, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

A Campbell County Grand Jury indicted the appellant for first degree premeditated murder, first degree murder in the perpetration of an especially aggravated robbery, and especially aggravated robbery. At trial, the State's first witness, Tyrell Phillips, a volunteer with the Stoney Fork Volunteer Fire Department, testified that on June 3, 2006, he and Bonnell Sexton were driving across Mountain Road in Caryville, Tennessee,[1] when they saw a red truck that appeared to have gone over an embankment. When Phillips went to investigate, he saw a body in the bed of the truck. Phillips and Sexton called the police and stayed until they arrived.

Campbell County Sheriff's Detective Larry Bolton testified at trial that he arrived at the scene at 7:00 a.m. on June 3, 2006. Detective Bolton said the truck appeared to have gone over an embankment on Mountain Road and crashed into a large tree. Detective Bolton recalled that the truck's taillights were on, the transmission was in drive, the ignition was turned forward, and the dash instruments were working. Inside the truck, police found a straw wrapper and a mint from a Sonic restaurant, a gray shirt with a maroon stripe, a cellular telephone and holder, a sales receipt from a BP gas station, and a blue disposable cigarette lighter. Police also found a wallet containing a twenty-dollar bill and a driver's license identifying the victim as Jonathan Pierce.

Steve Vinsant, a special agent with the Tennessee Bureau of Investigation (TBI), testified that the authorities learned from the appellant that on the night of the victim's death several people were cooking methamphetamine on Caryville Mountain. The cook site was at a flattened, man-made area where there was a natural gas or oil pump. Agent Vinsant opined that the victim was murdered at that site.

Linda Pierce, the victim's widow, testified that she last saw the victim on June 2, 2006. She said that night her sisters came to her home to watch movies. The victim often left when she and her sisters got together, and that night was no exception. The victim told Pierce he was going to Caryville Mountain to look at two pieces of property and to visit her brother-in-law who was camping there. Pierce said that the victim left around 10:30 or 11:30 p.m. and that he had $350 in cash when he left. At 8:00 a.m on June 3, 2006, Pierce received news that the victim had been killed. Pierce denied having a drug problem or owing a drug debt at the time the victim was killed.

John Storey, a Sonic restaurant employee, testified that at 12:20 a.m. on June 3, 2006, he served the victim a large drink. He recalled that the victim was in a red truck. He said he could recall the truck because of the distinctive wheels.

---

[1] In the record, this road is referred to as both "Mountain Road" and "Caryville Mountain Road."

Captain Don Farmer of the Campbell County Sheriff's Department testified that during the investigation of the victim's murder, the appellant gave eight statements. In each statement, the extent of the appellant's participation in the murder varied. On October 20, 2006, the appellant gave her first statement to police. In that statement, the appellant told police that she was not present when the victim was killed but that she was told about it after the fact. The appellant said that earlier that evening, she was with Lawrence Driver,[2] Tommy Wright, and Sammy Miracle. The group was in Miracle's black Chevrolet Blazer. The men told her they were going to the mountain, and they talked about beating someone who had "snitched." They told the appellant she would not want to be involved. The appellant saw numerous weapons in the Blazer, including an AK rifle, a knife, a Maglite flashlight, and a homemade "nunchaku," which the appellant described as two metal bars connected by a heavy chain in the middle.

After the men returned from Caryville Mountain, they took Miracle's Blazer to a shop for repairs, and she did not see the vehicle again for weeks. The appellant said that after the victim was killed, she was with Angela McCarty, Miracle's girlfriend, and that McCarty had Miracle's cellular telephone. Miracle called and told the appellant to erase "the pictures and stuff" on his telephone. The appellant said she saw photographs on the telephone showing Miracle or Wright throwing "some guy" out of a "good-sized truck." Additional photographs showed a bloody knife, Miracle or Wright hitting the man, the man slouched against the side of the truck, and the man propped in the bed of the truck.

Captain Farmer testified that on October 22, 2006, the appellant gave a second statement. In this statement, the appellant said that a couple days before the victim was killed, Driver, Wright, and Miracle said they were going to "put a good beating on him." The appellant said that hours before the men went to Caryville Mountain, she saw a knife and a homemade nunchaku in Miracle's Blazer.

Captain Farmer testified that on October 30, 2006, the appellant gave a third statement to police. In this statement, the appellant said that around June 2, 2006, she, Driver, Wright, and Miracle went to Caryville Mountain to cook methamphetamine. The appellant said they snorted and "shot up" methamphetamine, and Miracle and Driver shot guns into the air. Driver had a long gun, possibly a .22 caliber, and Miracle had "an AK . . . [with] a clip that came out of it."

While the methamphetamine was cooking, a red king-cab truck with chrome wheels pulled in near the cook site. Wright and Miracle "started going off . . . freaking out" and walked toward the truck. The appellant followed but stopped "halfway." According to the

_____

[2] In the record, this individual is also referred to as "Lawrence Shriver."

appellant, Wright "yanked" open the driver's side door of the truck and said "something about snitches." The victim told Wright, "[Y]ou've got me mistaken. Stop." Wright repeatedly hit the victim, and Miracle stood nearby. The appellant told police that Miracle was facing an indictment which had been "signed" by the victim and that they thought the victim was a "narc." The appellant said Miracle believed that if he were convicted of the pending charges, he faced a long sentence. However, he thought that if something were to happen to the victim, "nothing would come of the charges."

The appellant told police that when she saw blood on the victim, she told Wright to stop beating him. She said the victim fell and tried to get away from Wright. He continued to tell Wright that Wright had him "mixed up" with someone else. Nevertheless, Wright continued to beat the victim. The appellant told police that the victim "was on the ground. I mean, they [sic] was really no hope for him." The appellant said the victim started choking on his own blood, gasping for air. When Wright stopped beating the victim, he got a cellular telephone from the victim's truck, threw it away, and told the victim that he could not "call his buddies now." The appellant inferred that "he was talking about the law." Afterward, she ran off the mountain and called someone to pick her up.

The appellant said Miracle used his cellular telephone to take photographs of the incident; however, she did not know what happened to the telephone. The appellant said that a newspaper printed an article about the victim's murder and offered a reward for information about the crime. Miracle warned the appellant not to say anything. He asked if she had erased the photographs from his cellular telephone, and the appellant said that she had.

Captain Farmer testified that the following day, October 31, 2006, the appellant gave police a fourth statement. In this statement, the appellant told police that at 9:00 or 9:30 p.m. on June 2 or 3, 2006, she was at an Amoco convenience store in Caryville when she encountered the victim. The appellant was buying coffee filters for Driver, Wright, and Miracle to use to make methamphetamine. The victim was in the store buying something to drink. When the appellant walked out of the store, he asked if she needed a ride. The appellant said she did and got into the victim's red Chevrolet pickup truck. The appellant called Driver, and they decided to meet at a church on Mountain Road. The victim drove the appellant to the church, and they sat in the parking lot, waiting for Driver. The appellant said they talked while they waited, and the victim made advances towards her. The appellant said she rebuffed the victim's advances because he was married and because she was recovering from giving birth two months earlier.

After about thirty minutes of waiting, the appellant called Driver. Driver did not want to leave. He asked the appellant to come to the cook site, and the victim agreed to take her.

Upon arrival, the victim parked his truck at the cook site, and the appellant asked him to wait because she might need a ride off the mountain. The appellant told police that when she got out of the truck, Wright "flipped out on me and said that was the cops." The appellant assured Wright the victim was not a police officer, but Wright did not believe her. He approached the victim, saying the victim was "the law." The victim responded that Wright had him "mixed up" with someone else. Wright said that the victim's truck had been at the Econolodge in May when another individual was arrested in a drug bust there.

The appellant repeated her earlier description of Wright's beating of the victim. She added that in addition to beating the victim with his fists, Wright may have used a Maglite flashlight.

According to the appellant, Wright beat the victim until the victim lost consciousness, and then he put the victim in the bed of the truck. Driver asked Wright why he killed the victim, and Wright responded, "[B]ecause he's the law. It's either our life or his life. . . . Which would you rather it be?" The appellant recalled that Wright had blood all over his clothes. The appellant used Miracle's cellular telephone to take several photographs of the incident, but she told Wright she had not taken any photographs.

The appellant told police that Wright drove the victim's truck away from the cook site. The appellant, Driver, and Miracle drove Driver's Blazer to a location near "the Flats" where they smoked methamphetamine and waited for Wright to meet them. The appellant said that after picking up Wright, they went to a Budget Host Motel. The appellant said that her cousin, Daniel Roberson, rented a room for them in his name "in case the law came up there to do . . . warrant checks." Driver gave Roberson methamphetamine for renting the room in his name.

The appellant told police that once they were in the room, everyone took showers and changed clothes. The appellant said Wright told her to throw the bloody clothes away; however, she thought she could get the blood out of the clothes so she put them in her duffle bag, planning to wash them later.

Captain Farmer testified that the appellant gave police a fifth statement on November 28, 2006. In that statement, the appellant said that on June 4, 2006, she was at Seiber's Flats with B.J. Williams. The appellant said Williams told her that he and Donnie Jacks were "running a batch of dope, and he said . . . someone runs upon you, . . . it is either your life or their life." The appellant said that Williams never said he had killed anyone, but he did say things "got out of hand" after someone walked up on him and Jacks while they were making methamphetamine. The appellant said that after she spoke with Williams, she saw photographs on Miracle's cellular telephone of a man with blood on him. The man was

propped in the bed of a truck. The appellant said either Wright or Miracle was standing over the man. Miracle asked the appellant about his telephone and said "[i]t's a good damn thing I didn't have the cell phone because it would be my life on the line." The appellant told police she had not told the truth in her earlier statements because she was afraid something might happen to her child. She claimed that she had not been on Caryville Mountain when the victim was killed.

Captain Farmer said that the next day, the appellant gave a sixth statement. In that statement, the appellant said that on June 2, 2006, she, Williams, and Tim Richardson were staying at the Budget Host Motel in Caryville when Miracle and Jacks came by to get methamphetamine. Miracle and Jacks left, and soon after, around 9:30 or 10:00 p.m., Williams and Richardson left to meet them on Caryville Mountain. About twenty or thirty minutes later, Williams called and asked the appellant to bring them coffee filters.

The appellant said she walked to an Amoco convenience store to buy the filters. As she was leaving, she encountered the victim, and he asked why she was walking alone so late at night. The appellant told him she was taking some things to her father, and she needed to find a ride to Caryville Mountain where her brother was "four-wheeling." The victim offered the appellant a ride, and she accepted. The appellant told police that she had arranged to meet Williams at a church on Caryville Mountain. She said that she and the victim parked at the church, and, while they waited for Williams, the victim propositioned her. She turned him down because the victim was married and she was dating someone.

After waiting at the church fifteen or twenty minutes, the appellant called Williams. He did not want to pack up his equipment and asked if the appellant could get a ride to the cook site. The victim agreed to take the appellant.

When they arrived at the cook site, the appellant asked the victim to wait because she might need a ride off the mountain. The appellant said that Williams, Miracle, Jacks, and Richardson were at the cook site. Miracle accused the appellant of bringing "the law." He walked over to the truck, pulled out something that looked like a club, and struck the victim in the face one time. The appellant said Williams and Richardson, who were in the woods, ran to the site when she began screaming.

She said Miracle fought with the victim for about thirty seconds. During the fight, Miracle turned the victim's truck off and tried to get the keys out of the ignition. The appellant explained that Miracle thought the victim was an informant because a couple of months earlier someone they knew was "busted" for selling drugs at an Econolodge. A red truck like the victim's was at the motel at the time. The appellant told police she remembered Miracle pulling the victim out of the truck and hitting him again. When Miracle

-6-

hit the victim, blood splattered on Miracle. The appellant recalled that the victim fell to the ground, slouched against the truck, and made no attempt to get up. She said the victim was still moving, but it was "not a good movement." She also heard the victim gasping for air.

After the victim fell, Miracle, Williams, and Jacks loaded the victim into the bed of his truck. The appellant thought the victim was still alive. She said she did not think "someone would die that easily from a hit." The appellant told police that she took photographs of the incident with Miracle's cellular telephone. She said the incident occurred after midnight.

The appellant told police that after the victim was placed in the back of the victim's truck, Miracle got in the driver's side of the truck and Williams got in the passenger side. The appellant said that after Jacks and Richardson packed the methamphetamine cooking equipment, she, Jacks, and Richardson got into the two other vehicles at the site. She told police:

> The plan was to take [the victim] out on the Flats to make it look like, you know, the truck – you know, drop the body off there and take the truck somewhere else to make it look like, you know, he was – not to make it look like a murder but that – it didn't go as planned.
>
> . . . .
>
> . . . I heard them talking about taking the truck, you know, headed back towards – I don't know – I overheard them talking about putting the truck in neutral and the emergency brake on and then letting the emergency brake – releasing it and jerking the truck in drive and that way, it would look like they would run him off the road.

The appellant told police that after they pushed the victim's truck off the road, Williams got into the green Ranger with the appellant and Richardson. Miracle got into the Toyota truck with Jacks. On the way off the mountain, they stopped to smoke methamphetamine, then they went to the Budget Host Motel, took showers, and changed clothes. The appellant said she was supposed to wash the bloody clothes and return them, but she never did.

The appellant said Miracle told her they needed to keep the murder a secret and manufacture alibis for the time of the murder. The appellant and Williams planned to say

they were at the motel with Richardson and others. Miracle and Jacks planned to say they were at Jacks' residence in Briceville.

The appellant told police that after the incident, Miracle told her it was "a good damn thing" she did not have the cellular telephone with the pictures of the beating "because it'd be [her] life on the line." Williams instructed her to stick to the story they concocted at the motel after the murder. She said that her earlier statements were not true. She said she was being truthful in this statement because she wanted to clear her name.

Captain Farmer testified that on January 16, 2006, the appellant gave a seventh statement. The appellant said that on the night in question, she was with Travis Gaylor and Miracle in Gaylor's Honda Accord. She and Miracle were dating at the time. She said they stopped at a flat area with a gas pump to smoke a joint, and they were later joined by Scott Johnson and "Stretch." Stretch was waiting for a man with whom he had worked at Eagle Bend. Thereafter, a red truck pulled in beside Stretch's car, and the driver, the victim, talked with Stretch for a while. When Stretch left, Miracle accused the victim of being a "narc" and said the victim's truck was present when another individual was apprehended by police. The victim and Miracle began to fight, and Miracle hit the victim on the head, causing the victim to collapse.

The appellant said that Miracle and Gaylor loaded the victim into the bed of his truck. The appellant drove the victim's truck to the area where it was later found. The appellant said Miracle told her how to set the truck's parking brake; she put the truck in neutral, got out, and released the parking brake. Gaylor pushed the truck, and it went over the embankment. The appellant said they agreed to not tell anyone what they had done. The appellant said that during the incident she took several photographs of the victim to protect herself.

The appellant told police that she did not know who took money from the victim's wallet. However, the next day, Gaylor gave her four one-hundred-dollar bills. She said the day before the murder, Gaylor did not have any money. The appellant said she did not mention Gaylor's involvement in her earlier statements because he was her brother and she wanted to protect him.

Captain Farmer said that on January 17, 2006, the appellant gave police her eighth and final statement. In that statement, the appellant said that on the night the victim was killed, she took money from the victim's wallet and gave it to Gaylor.

The appellant told police that on the night of the murder, she overheard Stretch tell Scott Johnson he was meeting a man with whom he had worked at Eagle Bend so the man

could pay for pills the man had bought. The man, whom she identified as the victim, arrived and gave Stretch some money. Stretch told him he still owed $500. The victim said he did not take pills, but his wife did and her habit was getting out of hand.

The appellant said that Miracle asked the victim if he worked for "the law" and mentioned that he saw the victim's truck where someone was "busted." The appellant said the victim was writing in a small notebook, and Miracle asked if the pen was a camera. The victim took the pen apart to show Miracle that it was not a camera.

Miracle argued with the victim for about five minutes, then the victim got back into his truck. Miracle opened the truck's door and hit the victim until he collapsed. After he collapsed, Miracle and Gaylor discussed what to do with the victim. The appellant told police that after they disposed of the truck and the victim, they returned to the motel, took showers, and changed clothes. The appellant said the Bic lighter found in the victim's truck belonged to her.

Captain Farmer said that police were unable to locate the bloody clothes and the cellular telephone with photographs of the murder. He said the appellant's statements were taken while she was in jail. He surmised that she gave numerous statements in an attempt to protect Gaylor and Miracle. Captain Farmer observed that although the appellant gave several inconsistent statements, she consistently maintained that someone at the cook site referred to the victim as a "narc." Captain Farmer said that not all of the appellant's statements were initiated by police; sometimes the appellant sent notes from jail indicating she wanted to speak with police. Captain Farmer stated that on one occasion, the appellant said she wanted to give a statement then admitted she just wanted out of jail to smoke a cigarette.

Megan Stocks testified that she had known the appellant for two years. She said she was at Karen Lynch's house and overheard the appellant say that Miracle did not kill the victim but that she and her brother did. The appellant said it was more her brother's idea than hers. Stocks heard the appellant say that she had photographs of the murder on her cellular telephone; however, Stocks did not see the photographs. Stocks acknowledged that she was high on methamphetamine at the time, but she maintained that she was certain of the appellant's statements. Stocks said she initially told police that she did not know anything about the victim's death because she was scared.

Dana Ogg, a friend of the appellant, testified that the appellant told her she was not present when the victim was killed. The appellant asked Ogg if she could say she was with Ogg on the weekend the victim was killed.

Dr. Darinka Mileusnic-Polchan, the medical examiner who performed the victim's autopsy, testified that the victim's death was a homicide and that the cause of death was cranial cerebral injuries due to blunt head trauma. In other words, the victim had fractures to his skull and direct injury of his "brain substance." Dr. Mileusnic-Polchan said that on the right side of the victim's head, near the temple, she found a large laceration or tear. The laceration was deep enough to expose the skull and resulted from a fatal blow. She opined that the victim was likely struck by a rounded, pipe-like, metal object. Dr. Mileusnic-Polchan acknowledged that the wound could have been caused by a Maglite flashlight. She further opined that considerable force was required to cause the injuries.

Dr. Mileusnic-Polchan said the victim had a number of bruises, but she could not determine whether the bruises resulted from a beating, rough handling, or falling. However, she noted that the victim had an injury to his neck caused by someone applying pressure to his neck with a hand. The victim had petechiae or pinpoint hemorrhages in his left eye, and his right eye was very bruised. She opined that the victim was alive when these injuries occurred.

Dr. Mileusnic-Polchan said the victim was seventy-one inches tall and weighed 236 pounds. She said that if the assailant were facing the victim when the fatal blow was struck, the assailant may have been left-handed.

Karen Lynch was the first defense witness. Lynch testified that she had never heard the appellant make a statement about the victim's death. Lynch said that on June 10, 2008, the appellant's mother contacted her about providing an alibi for the appellant. Lynch said that she was not with the appellant on June 2, 2006, and that she could not provide an alibi. Lynch said she did not believe Stocks' claim that she had seen photographs of the victim on the appellant's telephone. Lynch said Stocks would not help the appellant because the appellant had slept with Stocks' boyfriend.

Agent Steve Vinsant testified that he had been involved in the investigation of the victim's murder from its inception. He investigated allegations that the victim's wife had a drug problem, but he never found evidence to substantiate the claims.

Based upon the foregoing proof, the jury found the appellant guilty of first degree premeditated murder, second degree murder, and especially aggravated robbery. The trial court imposed concurrent sentences of life, twenty-one years, and eighteen years, respectively. On appeal, the appellant challenges the trial court's ruling on the appellant's motion in limine to exclude a statement she made in the course of plea negotiations and the sufficiency of the evidence sustaining her conviction for first degree premeditated murder.

## II.  Analysis

### A.  Motion in Limine

The appellant complains that the trial court erred in failing to grant her motion in limine to exclude an October 20, 2007 statement she made in the presence of the prosecuting attorney during the plea negotiations.  During argument on the motion, defense counsel stated, "I've been told, because I wasn't in the case at that time, that it was agreed that statement would not be used if she didn't testify, but it would be admissible if she did testify."  The State asserted that it did not intend to use the statement at trial.  Defense counsel asked the trial court to rule on whether the State could use the statement to impeach the appellant should she choose to testify.  The trial court stated:

> Well, certainly, if it were – if it were attempted for introduction by the State, I would not allow it.  I mean, that's the type of thing that in my mind is a statement in furtherance of a settlement which is – is not something that is admissible.
>
> . . . .
>
> Under any circumstance.  If it is offered for impeachment, that's an entirely different situation.  And I guess we'll have to make that call when we get closer.  But, if she said something at the prior meeting that is contrary to what she said on the stand, then it's not – we're not talking about a hearsay situation.  What we're talking about, an actual – you know, an inconsistent statement which is not – what she said earlier is not being offered to prove the truth of the matter asserted.  It's offered to prove – or offered to impeach her testimony in this trial.  So it really bears on her credibility, and that would probably be admissible. . . .
>
> . . . .
>
> We'll deal with that at the appropriate time.

Defense counsel never again raised the issue, and the appellant chose not to testify at trial.

On appeal, the appellant argues that the trial court should have ruled that the State would be prohibited from introducing the statement as impeachment if her trial testimony

-11-

was inconsistent with her statement. The appellant contends that "[b]ecause of this erroneous ruling, [she] was forced to make a no-win decision as to whether or not she should testify."

Tennessee Rule of Evidence 410 provides:

> Except as otherwise provided in this rule, evidence of the following is not, in any civil or criminal proceeding, admissible against the party who made the plea or was a participant in the plea discussions:
>
> (1) a plea of guilty which was later withdrawn;
>
> (2) a plea of nolo contendere;
>
> (3) any statement made in the course of any proceedings under Rule 11 of the Tennessee Rules of Criminal Procedure regarding either of the foregoing pleas; or
>
> (4) any statement made in the course of plea discussions with an attorney for the prosecuting authority which do not result in a plea of guilty or which result in a plea of guilty later withdrawn. Such a statement is admissible, however, in a criminal proceeding for perjury or false statement if the statement was made by the defendant under oath, on the record, and in the presence of counsel.

See also State v. Hinton, 42 S.W.3d 113, 121 (Tenn. Crim. App. 2000). The rule specifically provides that statements made in the course of plea negotiations are not admissible, except in a proceeding for perjury or false statements.

In this case, although the trial court indicated the statement might be admissible, he specifically told counsel that he would address the issue at the appropriate time. Trial counsel never again raised the issue. Accordingly, the issue is waived. See Tenn. R. App. P. 36(a).

Further, we note that the statement complained of was not included in the appellate record for our review. The petitioner carries the burden of ensuring that the record on appeal conveys a fair, accurate, and complete account of what has transpired with respect to those issues that are the bases of appeal. Tenn. R. App. P. 24(b); see also Thompson v. State, 958 S.W.2d 156, 172 (Tenn. Crim. App. 1997). "In the absence of an adequate record on appeal,

-12-

this court must presume that the trial court's rulings were supported by sufficient evidence." State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991).

## B. Sufficiency of the Evidence

The appellant also contends that the evidence is not sufficient to sustain her conviction for first degree premeditated murder. She maintains that there is no evidence of "planning activity," and, instead, the proof demonstrates "a situation that got out of hand and resulted in an unintentional killing." On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). A premeditated killing is one "done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d). Premeditation can be inferred from the manner and circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has delineated several circumstances from which a jury may infer premeditation, including, but not limited to, declarations of the intent to kill, evidence of the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Id.

On appeal, the State notes that the appellant's conviction was based upon the theory of criminal responsibility. Generally, "[a] person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). Tennessee Code Annotated section 39-11-402(2) provides that a person is criminally responsible for the actions of another when, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person

-13-

solicits, directs, aids, or attempts to aid another person to commit the offense." This court has previously explained that

> [p]resence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred. No particular act need be shown. It is not necessary for one to take a physical part in the crime. Mere encouragement of the principal is sufficient.

State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998).

The proof against the appellant was based primarily on her statements to police. We note that "the jury was entitled to believe part of the defendant's statements while rejecting other parts." State v. Ricky T. Hughes, No. M2000-01846-CCA-MR3-CD, 2002 WL 1033340, at *5 (Tenn. Crim. App. at Nashville, May 21, 2002) (citing Batey v. State, 527 S.W.2d 148, 150 (Tenn. Crim. App. 1975)); see also State v. Steven Randall Willis, No. 01C01-9707-CR-00304, 1998 WL 895664, at * (Tenn. Crim. App. at Nashville, Nov. 24, 1998) (explaining that a jury may accept the portion of a defendant's statement which it deemed credible and reject the portion it deemed to be false); State v. Kenneth Wayne Robinson, Jr., No. 01C01-9207-CR-00234, 1993 WL 273953, at *3 (Tenn. Crim. App. at Nashville, July 22, 1993) (stating that a jury is entitled to accept the part of a defendant's proof they believe was consistent with the truth and reject the self-serving portion they believe is false).

In the light most favorable to the State, the appellant's statements revealed that she was helping Miracle and Driver and either Gaylor or Wright cook methamphetamine. The appellant stated that the men believed that when "running a batch of dope, and . . . someone runs upon you, . . . it is either your life or their life." Miracle believed the victim to be a "narc." The appellant said that Miracle was facing serious drug charges he thought would go away if something happened to the prosecuting witness, the victim. Therefore, Miracle beat the victim, resulting in his death. After beating the victim, the men loaded the victim into the back of his truck. The appellant said that she did not believe the victim was dead when he was loaded into the back of the truck. The appellant said that at Miracle's instruction, she drove the victim's truck to an area where she and the men pushed it off an embankment. A Bic lighter found inside the victim's truck belonged to the appellant. Afterward, they consumed methamphetamine and concocted alibis. Additionally, the appellant said that she took pictures of the crime as it was occurring, that she was in charge of taking care of the perpetrators' bloody clothing, and that she took money from the victim. In our view, this

evidence is sufficient to establish that the appellant was a participant in the crime and that she was criminally responsible for the premeditated murder of the victim.

The record reflects that the jury found the appellant guilty of both the first degree premeditated murder and the second degree murder of Pierce. Ordinarily, "when only one person has been murdered, a jury verdict of guilt on more than one count of an indictment charging different means of committing . . . murder will support only one judgment of conviction for [the] murder." State v. Cribbs, 967 S.W.2d 773, 788 (Tenn. 1998). Nothing in the record indicates that the trial court merged the appellant's second degree murder conviction into her first degree murder conviction. Accordingly, to preserve the appellant's right against double jeopardy, we must remand to the trial court for the judgments to be vacated and replaced by a single judgment that merges the convictions and effects a single judgment of conviction of first degree murder. See State v. Emmanuel Odom, No. M2007-01671-CCA-R3-CD, 2008 WL 4791488, at *6 (Tenn. Crim. App. at Nashville, Nov. 3, 2008), perm. to appeal denied, (Tenn. 2009).

### III. Conclusion

The case is remanded to the trial court for entry of a judgment of conviction reflecting that the appellant's conviction for second degree murder is merged into her conviction for first degree murder. The appellant's convictions are affirmed in all other respects.

_____
NORMA McGEE OGLE, JUDGE