IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 29, 2010

**FREDERICK A. MILLER v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Hamilton County**
**No. 263814     Rebecca J. Stern, Judge**

_____

**No. E2009-00232-CCA-R3-PC-FILED-MAY 20, 2011**

_____

A Hamilton County Criminal Court Jury convicted the Petitioner, Frederick A. Miller, of first degree murder, attempted first degree murder, and especially aggravated robbery, for which he received an effective sentence of life plus sixty years. Thereafter, the Petitioner filed for post-conviction relief, alleging his trial and appellate counsel were ineffective by failing to object to the "show-up" identification procedure, failing to preserve and pursue the Petitioner's speedy trial motion, and failing to properly cross-examine and impeach the State's witnesses. Further, the Petitioner alleged that the State denied the Petitioner's due process rights by failing to disclose the results of fingerprint analysis and gunshot residue tests. After a hearing, the post-conviction court denied the petition, and the Petitioner now appeals. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Donna Robinson Miller (on appeal) and Robin Ruben Flores (at trial), Chattanooga, Tennessee, for the appellant, Frederick A. Miller.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Senior Counsel; William H. Cox, III, District Attorney General; and Brian Finlay, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**I. Factual Background**

On direct appeal, this court summarized the proof adduced at the Petitioner's trial as follows:

On September 27, 1995, the victims, Thomas "Butch" Cripps and Christopher Calloway, were working at the Kwik-E Liquor Store on Rossville Boulevard in Chattanooga. The victim Cripps provided the following account of what transpired on this evening:

At about ten minutes till eleven, this young black male came in, walked around the building. I asked if I could help him, he said he was looking, walked back to the cooler at the rear of the store, walked around, looked around, looking more at the cabinets and counter and purchased a small miniature or one-ounce bottle of Canadian Mist, and then walked out and walked back to the right of the store. And that's when I told Chris you know, 'That was just a little strange.'

And about a minute and a half, two minutes later, another black male come [sic] in with a gun in his hand and a ski mask on and put his gun to the back of Chris's head, told-took him to the end of the counter-excuse me, took him to the end of the counter, made me walk backwards to him, brought us back up to the cash register, turned us both facing away from him, keeping his gun on us, took my gun from my waistband, demanded money. I gave him the money bag we kept under the register.

He then walked us back to the end of the counter and around and told us both to lay down on the floor face down, which we did. He asked where the camera was, or where the recorder was. I told him it was in another room, and at which time he backed up and shot Chris in the back of the head. And I jumped up, and trying to defend myself, and he shot me twice while we fought out

-2-

the front door, and then he ran off and I came
back inside and called the police.

Meanwhile, Officers Scott Taylor and Joseph Brooks of the Chattanooga Police Department were on patrol on Rossville Boulevard in the area of Kwik-E Liquor Store. They observed a black male in the alley between "Walter A. Woods and the liquor store." Officer Taylor was suspicious because all businesses in the area were closed except the liquor store. The officers turned in between "Walter A. Woods and the little barber shop building." As they did so, "there was another car that came out of the bushes with its headlights on as soon as we turned in." The [o]fficers activated their blue lights, and the vehicle, which was driven by Kevin Hinton, stopped. Hinton told the officers he was having problems with his lights.

While the officers were questioning Hinton, shots "rang out" from the liquor store. At this time, Officer Brooks placed Hinton in the back of the patrol car. After surveying the area and following the arrival of "backup[,]" Officer Taylor went inside the liquor store and discovered that the perpetrator had already fled the scene.

The victim Calloway died as a result of his wounds. The victim Cripps was hospitalized for three days, and it took him several months to recover from his injuries.

Following interviews with the police, Hinton implicated the [Petitioner] in the crimes. . . . Pursuant to an agreement with the State, Hinton testified against the [Petitioner] at trial[, saying] that "a few weeks before" September 27th, he was staying with Mr. Gary Fitch and Ms. Yarshaunajania Threatt at a residence on Taylor Street. Hinton introduced the [Petitioner], as Darius Jones, to Mr. Fitch and Ms. Threatt. According to Hinton, on September 27th, he, Mr. Fitch, and the [Petitioner] were in the front yard of the residence on Taylor Street. The men discussed that they "need to go get some cheese," meaning they needed money and were going to rob someone. Mr. Fitch chose not join Hinton and the [Petitioner]. Hinton testified that he and the [Petitioner] left the residence in Hinton's white

-3-

Bonneville, looking for a place to rob. The [Petitioner] decided on the Kwik-E Liquor Store. Hinton went into the liquor store first to see how many individuals were inside the store and, while inside, he purchased a bottle of Canadian Mist. He then returned to the vehicle and reported to the [Petitioner]. The [Petitioner], who was armed and wearing a ski-mask and a "blue-and-black or a blue-and-purple coat[,]" got out of the car and went inside the liquor store.

Hinton testified that the [Petitioner] phoned him "two or three hours later" and told him "to stay right there, he would be over there in a minute." Upon his arrival, the [Petitioner] asked "what happened . . . do they know who did it, and [Hinton] told him no." The [Petitioner] told Hinton not to worry because there was only "circumstantial evidence." Hinton stated that the [Petitioner] then went out of town for about three weeks.

The State called several witnesses to corroborate Hinton's testimony. The victim Cripps identified Hinton as the first man to enter the liquor store who purchased the bottle of Canadian Mist. He was unable to identify the shooter; however, he described the assailant as "approximately five-foot-ten, five-eleven, roughly 135, 145 pounds, had on a blue ski mask, more turquoise blue, dark pants and a shirt. . . . African American." Officer Taylor testified regarding his detention of Hinton in the nearby parking lot and his observations upon entering the liquor store following the robbery and murder.

Ms. Threatt testified that Hinton began staying at her house in the summer of 1995 and, at some point, the [Petitioner] began staying there too. On the day of the robbery and murder, Ms. Threatt overheard Hinton and the [Petitioner] talking about "they need some money." According to Ms. Threatt, the Defendant and Hinton left the residence in Hinton's car. She stated that after that evening, she did not see the Defendant again for "a couple of weeks or a month later." In the presence of the jury, Ms. Threatt viewed the video surveillance tape that had recorded the robbery and murder. She testified that she recognized the [Petitioner's] voice from the videotape. Ms. Threatt could not identify the jacket worn by the assailant on the

-4-

videotape, but she opined that the jacket "looked like the jacket [the Petitioner] had."

Mr. Fitch testified that he lived with Ms. Threatt on Taylor Street in 1995. According to Mr. Fitch, the [Petitioner] and Hinton "would come around every other day, every couple of days. . . . They both would stay off and on a couple nights a week maybe." He also recounted the conversation between him, the [Petitioner], and Hinton about going to "get some cheese." Mr. Fitch stated that following the evening in question, the [Petitioner] "stopped coming by" for "a couple of weeks[.]" When the [Petitioner] returned, he said "he'd been out of town with his family." The [Petitioner] also told Mr. Fitch that "[w]henever Kevin was drinking, he would talk too much." In December of 1995, Mr. Fitch overhead the [Petitioner] state that he was going to kill Hinton. Mr. Fitch also overheard a conversation between the [Petitioner] and Hinton about burning a jacket.

Officer Charles Russell of the Chattanooga Police Department testified concerning several statements made by the [Petitioner], who was transferred in January of 1996 from the Hamilton County Jail to the Police Services Center and asked to give a statement. The [Petitioner] declined to give a statement, but several statements made by him during the initial phase of the interview were admitted into evidence. On cross-examination, Officer Russell testified that during the search for the perpetrator immediately following the robbery and murder, officers apprehended a man named "James Burkes" in a nearby area of town, and he was initially a suspect in these crimes. According to Officer Russell, James had on dark pants and brown boots, which matched the description given by Officer Taylor of the individual he observed in the alleyway by Kwik-E Liquor Store prior to the robbery and murder.

The [Petitioner] did not testify on his own behalf. He did offer an expert witness who testified to the poor quality of the surveillance videotape. The [Petitioner] also called Officer Brooks. Officer Brooks testified that after taking Hinton to the

> Police Services Center for questioning following the robbery
> and murder, Hinton asked "if James was here also[.]"

State v. Fredrick Arnaz Miller, No. E2005-01583-CCA-R3-CD, 2006 WL 2633211, at **1-4 (Tenn. Crim. App. at Knoxville, Sept. 14, 2006). On appeal, this court affirmed the Petitioner's convictions and sentences. Id. at *1.

Subsequently, the Petitioner filed a petition for post-conviction relief, alleging that his trial and appellate counsel were ineffective by failing to object to Threatt's identification of the Petitioner's voice on the surveillance tape. The Petitioner alleged that the voice identification was unduly suggestive and was made without the Petitioner's counsel present. The Petitioner also alleged that counsel was ineffective by failing to preserve and pursue the Petitioner's speedy trial motion and by failing to properly cross-examine and impeach Threatt and Fitch. Further, the Petitioner alleged that the State denied the Petitioner's due process rights by failing to disclose evidence, namely the results of fingerprint analysis and gunshot residue tests.

At the post-conviction hearing, the Assistant District Attorney General who prosecuted the Petitioner testified that he became involved in the prosecution in 2002 but that the offense occurred in 1995. The prosecutor testified that Hinton, the Petitioner's co-defendant, initially agreed to cooperate with the State and testify against the Petitioner. However, on the day of the preliminary hearing, Hinton refused to testify because he was afraid the Petitioner would retaliate. Hinton was tried and convicted of first degree murder, but the conviction was reversed on appeal and remanded for a new trial. See State v. Hinton, 42 S.W.3d 113 (Tenn. Crim. App. 2000). On remand, Hinton again decided to cooperate in the prosecution of the Petitioner.

The prosecutor stated that there was adequate corroboration of Hinton's testimony. He noted that a jacket and a mask or cap were found in Hinton's car and that witnesses at trial stated that the Petitioner had previously worn those items. Additionally, Fitch and Threatt corroborated much of Hinton's story. The prosecutor specifically noted that upon watching the surveillance video of the crime, Threatt identified the voice of the perpetrator as the Petitioner's voice.

Regarding the cross-examination of Threatt, at post-conviction counsel's request the prosecutor read into the record Threatt's January 15, 2006 statement to police which said, in pertinent part:

> When I heard he [the Petitioner] was supposed to be coming to
> kill Kevin then I really shut up then because I ain't know if he

was going to pop up just like tonight. I told you he showed me
around the . . . store. That kind of scared me too and I couldn't
find your pager number nowhere so he kind of scared me off.

The prosecutor stated that he did not think Threatt's statement was necessarily inconsistent with her trial testimony, explaining that he did not believe Threatt was saying that she saw the Petitioner on January 15, 2006.

The prosecutor said that police originally had another suspect, James Burkes, but that police "cleared" Burkes. The prosecutor maintained that Burkes' mother corroborated most of Burkes' alibi.

The prosecutor testified that approximately one or two weeks before trial, the trial court granted an order for "major case prints" to be taken of the Petitioner to compare with fingerprints which were collected from the outside of the passenger side of Hinton's vehicle. However, neither the results of the major prints analysis nor of gunshot residue tests were available at the time of trial. The prosecutor stated that he never saw the results of those tests and that he did not pursue it after the conclusion of the trial. He further stated that he was unaware of any results as of the day of the post-conviction hearing. The prosecutor said that the fingerprint found on the outside of Hinton's car would not have been particularly helpful to the State's case because there was no way to definitively determine when the print was left. Additionally, the prosecutor noted that defense counsel argued to the jury that the Petitioner's fingerprints were not found on or in Hinton's vehicle.

The Petitioner's trial counsel testified that he was with the Petitioner when the Petitioner's fingerprints were taken. Counsel said he was informed the day before trial that the analysis had not been completed and that he never received the results of the analysis. He said he could have requested a continuance, but the Petitioner did not want his trial postponed.

Trial counsel said that he cross-examined Threatt about the differences between her version of events and versions espoused by Hinton and Fitch. Trial counsel acknowledged that Threatt gave a statement to police; however, he did not think Threatt was saying that she saw the Petitioner at a store on a day he was supposedly incarcerated. When asked if he should have cross-examined Threatt about this possible falsehood, counsel responded that he did not want to inform the jury that the Petitioner was incarcerated and that "it was probably a tactical decision." Moreover, trial counsel said he challenged Threatt's credibility in other ways, including questioning her about inconsistencies in her testimony. Trial counsel also noted that at the end of his cross-examination of Threatt, she said, "I just don't know." Trial counsel said, "I felt that that was enough to destroy her credibility." Trial

counsel said that at trial, he objected to Fitch's testimony because it consisted of hearsay but that his objection was overruled.

Trial counsel said he did not challenge the admissibility of the surveillance videotape of the crime. However, trial counsel called an expert witness to testify regarding the poor sound quality of the videotape, thereby calling into question the reliability of any identification made from the videotape. Trial counsel also argued that Burkes, not the Petitioner, was likely the perpetrator. Trial counsel stated that the Petitioner never provided any information regarding a possible alibi defense.

The Petitioner's appellate counsel said that he was appointed to represent the Petitioner at sentencing and on appeal after trial counsel was allowed to withdraw. Appellate counsel acknowledged that he did not raise an issue regarding the authentication of the videotape. He explained that his research indicated that the only viable issues related to the weight, not the admissibility, of the videotape. He also said he did not challenge Threatt's identification of the Petitioner's voice on the videotape as being "unduly suggestive." Appellate counsel acknowledged that he did not raise a speedy trial issue because it had not been preserved for appeal.

The Petitioner testified that he and trial counsel spent sufficient time together. He said trial counsel should have done more to discredit Threatt. He complained that he wrote trial counsel notes during trial but that counsel did not ask the questions the Petitioner suggested. The Petitioner said he was never told that the fingerprint analysis or the gunshot residue tests had not been completed at the time of trial. He said that he and counsel never discussed the possibility of a continuance but that he would have been willing for the case to be continued so that the tests could be completed.

At the conclusion of the post-conviction hearing, the post-conviction court denied the petition, finding the Petitioner failed to establish his claims of ineffective assistance. On appeal, the Petitioner challenges the post-conviction court's ruling.

## II. Analysis

To be successful in his claim for post-conviction relief, the petitioner must prove all factual allegations contained in his post-conviction petition by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). "'Clear and convincing evidence means evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" State v. Holder, 15 S.W.3d 905, 911 (Tenn. Crim. App. 1999) (quoting Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Issues regarding the credibility of witnesses, the weight and value to be accorded their

testimony, and the factual questions raised by the evidence adduced at trial are to be resolved by the post-conviction court as the trier of fact. See Henley v. State, 960 S.W.2d 572, 579 (Tenn. 1997). Therefore, the post-conviction court's findings of fact are entitled to substantial deference on appeal unless the evidence preponderates against those findings. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001).

A claim of ineffective assistance of counsel is a mixed question of law and fact. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999). We will review the post-conviction court's findings of fact de novo with a presumption that those findings are correct. See Fields, 40 S.W.3d at 458. However, we will review the post-conviction court's conclusions of law purely de novo. Id.

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, "the petitioner bears the burden of proving both that counsel's performance was deficient and that the deficiency prejudiced the defense." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). To establish deficient performance, the petitioner must show that counsel's performance was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). To establish prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. Moreover,

> [b]ecause a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component.

Goad, 938 S.W.2d at 370 (citing Strickland, 466 U.S. at 697).

The Petitioner specifically alleges that his counsel "were clearly ineffective for failing to object to the State's admission at trial of a voice identification which was unduly suggestive and without counsel at a critical stage." The Petitioner likens the voice identification process to a "show-up identification" and argues that the identification process was unduly suggestive because Threatt listened to only one voice on the videotape. The post-conviction court found that, contrary to the Petitioner's claim, trial counsel filed a motion to suppress, challenging the admissibility of the voice identification. The record supports this finding. Regardless, we conclude that the identification in the instant case was not analogous

to a "show-up" or a "line-up." The record indicates that the videotape Threatt saw and heard was a recording of the crime. As this court noted on direct appeal, "Threatt testified that she knew the [Petitioner] and was familiar with his voice." Miller, No. E2005-01583-CCA-R3-CD, 2006 WL 2633211, at *16. Further, this court noted that "'[f]or authentication purposes, voice identification by a witness need not be certain; it is sufficient if the witness thinks he can identify the voice and express his opinion.'" Id. (quoting Stroup v. State, 552 S.W.2d 418, 420 (Tenn. Crim. App. 1977)). Therefore, we can discern no reason for the voice identification to have been suppressed. Accordingly, neither trial nor appellate counsel were ineffective for failing to pursue this issue further.

The Petitioner alleges that his counsel were ineffective by failing to "properly cross-examine and impeach two State witnesses, Threatt and Fitch" and by failing to pursue the issue on appeal. The Petitioner alleged that in Threatt's statement to police on January 15, 2006, she said she saw the Petitioner that day in a store. The Petitioner asserts that he was incarcerated on January 15 and that counsel failed to question Threatt about the impossibility of her statement. At the post-conviction hearing, trial counsel reread the statement and explained that, in his view, the Petitioner had misconstrued the statement and that Threatt was not saying that she saw the Petitioner on January 15. Trial counsel testified that he made a strategic decision not to point out to the jury that the Petitioner was incarcerated at the time Threatt made the contested statement. On appeal, this court may not second-guess the tactical or strategic choices of counsel unless those choices are based upon inadequate preparation, nor may we measure counsels' behavior by "20-20 hindsight." See State v. Hellard, 629 S.W.2d 4, 9 (Tenn. 1982). Moreover, "[a]llegations of ineffective assistance of counsel relating to matters of trial strategy or tactics do not provide a basis for post-conviction relief." Taylor v. State, 814 S.W.2d 374, 378 (Tenn. Crim. App. 1991). Moreover, appellate counsel testified that he pursued on appeal only those issues which had been preserved at trial, which, because of the slim likelihood of success, is another strategic choice. The post-conviction court found that the Petitioner failed to establish that counsel were ineffective in this regard; we agree.

The Petitioner complains that counsel failed to question Threatt about discrepancies between her testimony and Fitch's testimony and that counsel "fail[ed] to impeach [her] testimony by pointing out that she stated that she didn't remember something twenty-eight times." However, trial counsel testified that he cross-examined the witnesses about discrepancies between the versions of events given by Hinton, Threatt, and Fitch. Moreover, trial counsel said that at the end of cross-examination, Threatt said, "I just don't know," which he felt "destroy[ed] her credibility." We, like the post-conviction court, conclude the Petitioner is not entitled to relief in this regard.

The Petitioner alleges that counsel should have impeached Fitch and Threatt by asking "whether they had made a deal to testify even though they had both indicated prior to trial that they were concerned about potentially being charged." The Petitioner adduced no proof about an alleged deal. Accordingly, his complaint is, at best, speculative and does not entitle him to post-conviction relief.

The Petitioner also alleges that his counsel were ineffective by failing to preserve and to appeal the denial of the Petitioner's pro se motion for a speedy trial. The post-conviction court noted that the presentment charging the Petitioner was issued on February 12, 2003, and that the Petitioner filed a pro se speedy trial motion on March 25, 2003. The Petitioner's trial began on May 25, 2004. In his petition, the Petitioner alleged that

> [the State's] delay in bringing petitioner to [trial] violated his due process rights in that [the] crime happened on 9-27-95 [but] petitioner did not go to trial until[] May 25, 2004. . . . [A]lthough petitioner was charged in 1997, the case was dismissed and charges [were not] filed again until September 2002 where they [were] dismissed, but petitioner was indicted five months later.

In his appellate brief, the Petitioner again asserts the foregoing time line of events. However, neither his petition nor his brief contain any citations to the record to support this particular time line, in violation of both Rule 10(b) of the Rules of the Court of Criminal Appeals and Tennessee Rule of Appellate Procedure 27(a)(7).

Regardless, we note that the right to a speedy trial, which is guaranteed by the Sixth Amendment to the United States Constitution and by article I, section 9 of the Tennessee Constitution, "attaches at the time of arrest or indictment, whichever comes first, and continues until the date of the trial." State v. Vickers, 985 S.W.2d 1, 5 (Tenn. Crim. App. 1997). We note that there are four factors which are important to an examination regarding a speedy trial issue: "the length of the delay, the reason for the delay, the defendant's assertion of the right, and the prejudice suffered by the defendant from the delay." State v. Utley, 956 S.W.2d 489, 492 (Tenn. 1997). The only allegation the Petitioner makes regarding prejudice is the diminished memory of his alibi witness, Charles King. However, the post-conviction court accredited the testimony of trial counsel regarding the Petitioner's failure to provide any information regarding an alibi. Therefore, the post-conviction court determined that the Petitioner failed to prove that he was prejudiced by any alleged deficiency by counsel. We agree and thus conclude the Petitioner is not entitled to relief in this regard.

In conjunction with his speedy trial issue, the Petitioner appears to argue that his due process rights were violated because "for nine (9) years [he] was faced with oppressive pretrial incarceration and anxiety and concern caused by nine (9) years of unresolved charges which were twice dismissed and thrice instituted." Generally, to establish a due process violation stemming from a pre-accusatorial delay, an accused must prove the following prerequisites: (1) there was a delay; (2) the accused sustained actual prejudice as a direct and proximate result of the delay; and (3) the State caused the delay in order to gain a tactical advantage over the accused or to harass the accused. Utley, 956 S.W.2d at 495 (citing United States v. Marion, 404 U.S. 307, 324-25 (1971), and State v. Gray, 917 S.W.2d 668, 671 (Tenn. 1996)); see also State v. Carico, 968 S.W.2d 280, 284-85 (Tenn. 1998). Again, we note that the Petitioner failed to establish prejudice relating to the delay. Although the Petitioner claimed the memory of his alibi witness was diminished by the delay, counsel testified that the Petitioner provided no alibi witnesses. Further, the Petitioner failed to have King testify at the post-conviction hearing regarding the effect, if any, of the delay. Moreover, although the Petitioner complains that he was subjected to pretrial incarceration, he acknowledges that his confinement was based on other charges. Therefore, based upon the record before us, we conclude that the Petitioner failed to prove a due process violation.

Additionally, the Petitioner maintains that the post-conviction court erred in denying his claim regarding the State's failure to disclose the results of fingerprint analysis and/or gunshot residue tests in violation of Brady v. Maryland, 373 U.S. 83 (1963). Any "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. In order to prove a due process violation under Brady, a petitioner must show that (1) he requested the allegedly withheld information, (2) the State suppressed the information, (3) the information was favorable to the accused, and (4) the information was material. Id.; State v. Edgin, 902 S.W.2d 387, 389 (Tenn. 1995). Nothing in the record demonstrates that the defense requested the results of the fingerprint analysis or the gunshot residue tests or that the State suppressed them. The results of the tests are not in the record before us, and the Petitioner has not shown that the results were either favorable or material to his case. The Petitioner also contends that the prosecutor committed prosecutorial misconduct by failing to "follow-up" on the tests post-trial. This contention is unavailing. Thus, the Petitioner has not demonstrated that he is entitled to post-conviction relief on this issue.

### III.  Conclusion

Concluding that the Petitioner failed to establish that either his trial or appellate counsel were ineffective, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE