IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 19, 2020

**BRANDON HARRIS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 10-01849    Lee V. Coffee, Judge**

_____

**No. W2019-00996-CCA-R3-PC**

_____

The Petitioner, Brandon Harris, appeals from the denial of post-conviction relief arguing that trial counsel was ineffective in failing to investigate and call witnesses, failing to present expert testimony of mental impairment, and failing to object to the State's certification of a voice recognition expert.  Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J. ROSS DYER, JJ., joined.

Terita M. Hewlett, Memphis, Tennessee, for the Petitioner, Brandon Harris.

Herbert H. Slatery III, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Leslie Byrd, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

This appeal stems from the shooting and robbery of Antoine Hawkins, and the related assaults of Michael Reynolds, Johnnie Morgan, and Antonio Hawkins.  A jury convicted the Petitioner of especially aggravated robbery, reckless endangerment, and three counts of assault, all stemming from the same home invasion criminal episode.  He received an effective sentence of twenty-eight years, eleven months, and twenty-five days' imprisonment.  This Court summarized the underlying facts of the Petitioner's conviction on direct appeal.  See State v. Brandon Harris, No. W2012-02574-CCA-R3-CD, 2014 WL 2809685, at *1-13 (Tenn. Crim. App. June 19, 2014).  Because the Petitioner alleges that trial counsel was ineffective in examining witnesses and making objections at trial, we will briefly summarize the relevant facts below.

On November 21, 2008, Michael Reynolds, Johnnie Morgan, and Antonio and Antoine Hawkins were at home when they heard a knock on the door. [1]  Id. at *1-2. Reynolds did not recognize the men outside, but Antonio appeared to recognize them, and invited the Petitioner and another man inside. Id.  Antonio asked the two men to stay in the living room with Reynolds while he went into the back of the house, where Antoine and Morgan were, but the Petitioner followed Antonio into the back. Id.  Morgan attempted to stop the Petitioner, but the other man who arrived with the Petitioner held a pistol above Morgan's head and said, "[g]et down. You know what this is." Id. at *2.  Antonio fled the house, and a third man, standing outside of the house, chased after him. Id. at *1-2.

The Petitioner went into the back room and shot Antoine three times in the stomach. Id. at *1-3.  After shooting Antoine, the Petitioner rummaged through Antoine's pockets and struck him in the head with the butt of his pistol. Id. at *2-3.  The Petitioner took Antoine's money, watch, and cell phone, began to walk away, and then stopped and shot at Antoine a final time before fleeing the house in a white Dodge Charger. Id.

Antoine was taken to the hospital, where doctors removed a portion of his intestines. Id. at *3.  Antoine spent a week and a half at the hospital, and an additional month recovering at home. Id.  While recovering, he was unable to care for himself and was taken care of by his sister. Id.

Reynolds, Morgan, and Antoine each identified the Petitioner in a photo line-up the day after the shooting. Id. at *1-3.  At trial, Reynolds testified that he felt afraid and did not want to prosecute the shooting, but he had no doubt that the Petitioner was the man he saw shoot Antoine. Id. at *1.  Morgan testified that his "eyes w[ere] glued on [the Petitioner]," and Antoine testified that he had no doubt that the Petitioner was the person who shot him. Id.  at *2-3.

Juaquatta Harris testified that she was responsible for monitoring inmate phone calls for the Shelby County Sheriff's Office. Id. at *4.  She testified that all phone calls made by inmates were recorded and that each inmate was given a separate record identification (R & I) number to track their calls. Id.  A CD of phone calls placed by the Petitioner was played for the jury. Id.  Harris testified that there was a problem at the jail with inmates using other inmates' R & I numbers to disguise their phone calls. Id.  Harris stated that she recognized the Petitioner's voice in the sense that he may have "talked about his cases, courts, codefendants, [or] relatives." Id.  Harris conceded that she had not spoken with the Petitioner before, and that inmates' voices could sound similar over the phone. Id.

---

[1] To differentiate between Antonio Hawkins and Antoine Hawkins, we will refer to them using their first names.  We intend no disrespect by this practice.

- 2 -

Lieutenant Kee of the Memphis Police Department was the lead investigator in the Petitioner's case. Id. at *5. Lieutenant Kee testified that while Antoine identified the Petitioner in a photo line-up the day after the shooting, Antoine could not identify him as the shooter. Id. Kee also developed Eric Walker and Jacob Halliburton as suspects, but none of the victims could identify Walker and Halliburton, so they were not charged. Id. A third suspect, who went by the nickname Little Jake, was never identified. Id.

The Petitioner testified that, while he was present at the victims' house, he was not the shooter. Id. Instead, he testified that he brought Walker and Halliburton to the house to purchase drugs, and that Walker shot Antoine while robbing him. Id. The Petitioner testified that he never intended to rob or shoot anyone and that he attempted to stop Walker from shooting Antoine. Id. On cross-examination, the Petitioner readily admitted that it was his voice on the jail-house recordings. Id. at *6.

The Petitioner was found guilty of especially aggravated robbery, the lesser-included offense of reckless endangerment, and three lesser-included counts of assault. Id. at *7. The trial court ordered the Petitioner's sentences to run consecutively, for a total effective sentence of twenty-eight years, eleven months, and twenty-five days' imprisonment. Id. This Court affirmed the judgments of the trial court on appeal, and permission to appeal to the Tennessee Supreme Court was denied on November 21, 2014. Id. at *13.

With the assistance of counsel, the Petitioner filed a timely petition for post-conviction relief on April 27, 2015. Several unidentified attorneys were appointed to represent the Petitioner before current, post-conviction counsel was privately retained on March 28, 2017. Post-conviction counsel filed an amended petition on August 16, 2017.

At the March 29, 2019 post-conviction hearing, the Petitioner testified that his family had privately retained trial counsel and that the two had a good rapport. The Petitioner told trial counsel the name of a potential exonerating witness, Julie, who trial counsel interviewed but decided not to call at trial. The Petitioner testified that he did not know Julie's last name, but he knew she "stayed in the neighborhood." Julie was the mother of Antoine's child, and she reportedly heard Antoine identify someone other than the Petitioner as the shooter.

The Petitioner was also unsatisfied with trial counsel's questioning of two of the victims, Reynolds and Morgan. The Petitioner conceded that Reynolds and Morgan testified at trial, but he thought that trial counsel should have cross-examined them more aggressively. Reynolds had told police, and signed a corresponding waiver, that he did not want to prosecute the Petitioner, even though he positively identified the Petitioner at trial. The Petitioner believed that it was error for trial counsel to have allowed Reynolds to testify

without rigorously cross-examining him about why he initially did not want to testify. The Petitioner also believed it was error not to cross-examine Morgan about his use of glasses. The Petitioner argued that Morgan was not wearing glasses at the time of the shooting, and he should not have been able to identify him as the shooter.

Finally, the Petitioner testified that trial counsel failed to call an expert mental health witness to present a mental health related defense. The Petitioner testified that he had been diagnosed with general anxiety disorder and took medication for it. The Petitioner had two mental health evaluations, but the doctors were not presented as witnesses at trial. The Petitioner argued that mental health testimony could have shown that he was not the shooter and could have mitigated the severity of his sentence, had it been presented.

On cross-examination, the Petitioner agreed that Reynolds had testified at trial that he originally did not want to testify because he was afraid of the Petitioner's gang affiliations. The Petitioner did not remember trial counsel's cross-examination of Reynolds or that trial counsel had elicited testimony from Reynolds that he had not actually seen the shooting take place. Likewise, the Petitioner testified that he could not remember trial counsel's cross-examination of Morgan or that trial counsel thoroughly questioned him, even though his testimony was unequivocal and unwavering. The Petitioner agreed that he had seen two mental health experts prior to trial but denied having seen their final reports. According to the Petitioner, trial counsel never spoke to him about the fact that the evaluations did not support a mental health defense and would not be useful at trial.

Trial counsel testified that he had been practicing law for nearly twenty years at the time of the Petitioner's trial, with roughly ninety percent of his practice in criminal law. Trial counsel and his paralegal met with the Petitioner numerous times, and he employed a private investigator to gather facts before trial. Trial counsel considered calling Julie as a witness, but he decided against it because her testimony was hearsay and would not have been admissible at trial. He interviewed Reynolds and Morgan, but both insisted that the Petitioner was the shooter and denied recognizing the other suspects, Halliburton and Walker. Trial counsel believed that he was successful in cross-examining Reynolds and Morgan and credited the inconsistencies in their testimony for the conviction on the lesser included offense of reckless endangerment rather than the charged offense of attempted second degree murder.

Trial counsel filed a notice of his intent to argue an insanity defense prior to trial and had the Petitioner examined by mental health professionals. Although the first expert provided a favorable recommendation for the defense, a second, more extensive evaluation by the Memphis Mental Health Institute (MMHI) found that the Petitioner was competent to stand trial and that a diminished capacity defense could not be supported. Trial counsel

did not call any mental health experts at trial since the issue had been resolved against them.

Finally, trial counsel testified that he objected to the testimony of, and vigorously cross-examined, Juaquatta Harris. The post-conviction court noted that trial counsel filed a motion in limine objecting to Harris' testimony, but that the motion was ultimately denied. Trial counsel did not object to Harris' qualifications as an expert witness because the State had not proffered her as an expert. Instead, trial counsel cross-examined her about her ability to recognize voices on the recordings to raise doubt that the Petitioner was the person speaking on the recording. Overall, trial counsel believed that the results of the trial were "fantastic" because the Petitioner was found not guilty of attempted second degree murder as charged.

The post-conviction court denied the petition in a thirty-two-page, written order, entered on May 5, 2019. The post-conviction court found that the issues raised in the petition were either waived or had been previously determined. The post-conviction court found that the Petitioner did not present any additional fact or expert witnesses at his hearing, and therefore failed to demonstrate prejudice. The post-conviction court specifically accredited the testimony of trial counsel and noted that the Petitioner had "selective amnesia." The Petitioner filed a timely notice of appeal on June 5, 2019.

## ANALYSIS

On appeal, the Petitioner argues that trial counsel was ineffective in failing to (1) investigate, cross-examine, or call several witnesses; (2) present expert testimony to support a mental health related defense; and (3) object to the State's introduction of Juaquatta Harris as an expert witness. In response, the State contends, and we agree, that the Petitioner failed to demonstrate deficient performance or prejudice.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgement of a constitutional right. Tenn. Code Ann. § 40-30-103. The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

Vaughn, 202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

Applying the above well settled law to the instant case, we conclude that the Petitioner is not entitled to relief. The Petitioner argues trial counsel was ineffective for failing to investigate the facts of the case and call Halliburton, Walker, and Julie as witnesses; and ineffective in failing to present expert testimony to support a mental health related defense. As an initial matter, the Petitioner failed to present any of the above witnesses or a mental health expert at the post-conviction hearing, and this Court will not speculate as to what their testimony may have been had they been called at trial. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). In any event, trial counsel agreed that the Petitioner displayed some mental health issues. Even though trial counsel repeatedly explained the concept of criminal responsibility for the conduct of another to the Petitioner, the Petitioner insisted he was innocent because he was not the shooter in this offense. Trial counsel said despite his best efforts, the Petitioner had problems with the concept of criminal responsibility, so he wanted the Petitioner to be evaluated with this legal concept in mind.

Trial counsel also filed a notice of his intent "to assert a defense of insanity at the time of the alleged crime and/or due to [the Petitioner's] inability to assist counsel." Within the same motion, trial counsel attached and sought to introduce the expert testimony of a forensic coordinator from West Tennessee Forensic Services (WTFS), who concluded that the Petitioner's "ability to confer with counsel and participate in his defense [was] questionable." The WTFS clinician referred the Petitioner to an intellectual disability specialist, who later determined that the Petitioner was competent to stand trial and that a defense based on diminished capacity could not be supported. After receiving the second opinion and report and considering the limited funding available for additional experts, trial counsel abandoned the insanity defense and re-focused his defense strategy on discrediting the State's witnesses. Although the Petitioner testified as to his current diagnosis of "generalized anxiety disorder," there was no proof at the hearing to establish if or how this diagnosis impacted the offense. Based on the above proof, the post-conviction court determined, and we agree, that the Petitioner failed to establish by clear and convincing evidence that trial counsel was ineffective in failing to present a mental health defense.

The Petitioner also claims trial counsel was ineffective in his investigation and cross-examination of witnesses. The record shows that trial counsel employed a private investigator and spoke with the Petitioner at length about the facts of the case. His investigator asked the victims if they recognized Halliburton and Walker, but they denied recognizing either suspect. Trial counsel investigated Julie as a potential witness, but he

determined that her testimony was either not relevant or inadmissible hearsay. Finally, trial counsel credited the inconsistencies gained through cross-examination of Morgan on identification as a major contributor to the reduced verdict. The post-conviction court accredited the testimony of trial counsel, and we do not review a post-conviction court's determination of a witness's credibility. See Vaughn, 202 S.W.3d at 115 (Tenn. 2006). The record does not preponderate against the findings of the post-conviction court, and the Petitioner is not entitled to relief on these issues.

As his last issue, the Petitioner argues that trial counsel was ineffective in failing to object to the testimony of Juaquatta Harris on the ground that the State had not qualified her as an expert in voice recognition. At trial, Harris testified, in pertinent part, as follows:

> She explained that inmates were given a unique record identification ("R & I") number that was used to track the inmate's calls. All inmate calls were recorded. A CD of phone calls placed by the [Petitioner] was admitted as an exhibit and played for the jury.
>
> Harris admitted there was a problem in the jail with inmates allowing other inmates to use their R & I number. Asked if she used any "voice recognition" in identifying the [the Petitioner's] calls, Harris stated that she recognized the [the Petitioner's] voice. However, she acknowledged that she had never had a conversation with [the Petitioner] but explained that she used "voice recognition" in the sense that [the Petitioner] or someone else may have said the [Petitioner's] name in the call, or he may have "talked about his cases, courts, codefendants, relatives." Harris stated that she sometimes compared the voices on a call with other inmates' voices because inmates' voices could sound similar.

Brandon Harris, 2014 WL 2809685, at *4.

On direct appeal, the Petitioner argued that the trial court erred in allowing Harris to testify regarding the recordings of his phone calls from jail because the State did not qualify her as an expert and she did not have the necessary expertise to testify as she did. However, the record showed that trial counsel objected to Harris' testimony on the grounds that the State failed to disclose her as a witness during discovery, a claim the trial court resolved in favor of the State. Upon admitting the jail calls, trial counsel made no further objections. We therefore concluded that the issue had been waived because the Petitioner was bound by the evidentiary theory set forth at trial and could not change theories on appeal. Waiver notwithstanding, we determined that any error in not objecting to Harris'

testimony on this ground was harmless because the Petitioner readily admitted under cross-examination at trial that it was his voice on the calls.

We do not have the benefit of the full CD containing the jail phone calls in the record for post-conviction relief, and the Petitioner does not refer to any specific statement in his brief. As detailed in our opinion on direct appeal, the Petitioner testified and conceded to the following conversations:

> The [Petitioner] admitted that it was his voice on the phone calls recorded from jail. He agreed that, in one of the calls, he claimed that the police officers circled a photograph of him in an effort to make him believe that the person who had been shot had identified him. The [Petitioner] insisted that the police circled the photograph of him. The [Petitioner] acknowledged that he was not home all day on the day of the shooting, despite his mother indicating in a phone call that she told the police that he was at home all day. He also acknowledged that he told his mother in that phone call that they needed to find more witnesses to say that he was at home. However, he explained that he was not talking about getting witnesses to testify about his whereabouts during the time period of the shooting.
>
> The [Petitioner] conceded that, during a phone call with his brother, he told his brother that he suspected a woman named Dominique of "informing" on him to the police. He said that he had not told Dominique anything about the offense but that she might have "hear[d] stuff through the neighborhood." He acknowledged telling his brother that he would "beat that bitch" if she "lied on" him.

Brandon Harris, 2014 WL 2809685, at *6.

In its oral ruling, the post-conviction court concluded that trial counsel "did object at trial, did complain that [Harris] was not an expert, and the Court ruled that [Harris], in fact, was not being presented as an expert but was being presented as a keeper of record." The post-conviction court further noted that, while acting as the trial court, it "did not allow [Harris] to identify the voice as this [Petitioner]." Rather, Harris testified "how phone calls [are] made by RNI numbers and by folks saying who they are. And [Harris] did tell the jury that no, she cannot identify the voice, she doesn't know who . . . [the Petitioner] is . . . . but she did identify the procedure in which these phone calls were made." The post-conviction court additionally concluded that this issue had been "previously determined" and that the Petitioner was not entitled to "plain error relief." Tenn. Code Ann. § 40-30-

106 (h) ("A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing. A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence.").

While there is some overlap with our resolution of this issue on direct appeal, the precise question presented here concerns *trial counsel's* failure to object to Harris' testimony on the ground that the State failed to qualify her as an expert in voice recognition. The Petitioner does not articulate in this appeal how trial counsel was deficient in failing to object on this ground or whether he would have prevailed had he done so. In any event, Rule 901 of the Tennessee Rules of Evidence governs authentication of recordings and states, "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Rule 901(b)(5) additionally provides an illustration of how voice authentication may occur and provides, "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." This court has additionally held that identifying a caller's voice "is not the only means by which an audio recording of a phone call may be authenticated." State v. Morris Marsh, No. E2013-01343-CCA-R3-CD, 2014 WL 4366087, at *14 (Tenn. Crim. App. at Knoxville, Sept. 4, 2014) (citing State v. Hinton, 42 S.W.3d 113, 127 (Tenn. Crim. App. 2000) (911 phone call properly authenticated when custodian of recording explained the process by which the recording was "processed and retrieved," stated the time and date of the phone call, and the address associated with the phone number from which the phone call originated); State v. Jabari Reynolds, No. E2015-00499-CCA-R3-CD, 2017 WL 936521, at *14 (Tenn. Crim. App. Mar. 9, 2017) (jail phone call properly authenticated by keeper of the records based on description of the process for making the calls and unique inmate number).

The record shows that several months prior to trial, trial counsel filed a motion in limine to preclude the State from admitting any recordings of jail phone calls. Although the substance of trial counsel's motion challenged Harris' qualifications to identify the Petitioner's voice, the trial court denied the motion and admitted the jail phone calls based on Harris' status as the keeper of records. Trial counsel also objected to the testimony of Harris based on the failure of the State to provide Harris as a witness in discovery, which was also denied. Trial counsel then refocused his strategy and "vigorously cross-examin[ed]" Harris on her ability to identify the Petitioner's voice on the phone. Trial counsel attacked the lack of any voice recognition software at the jail and noted that Harris, as a human substitute, was fallible. However, as noted by the post-conviction court, Harris did not testify as an expert in voice recognition. Rather, the record shows she identified the Petitioner as an individual on the calls based on the procedures in place at the jail and

other information mentioned during the calls unique to the Petitioner's case.  Accordingly, the jail phone calls were properly authenticated, and the trial court did not abuse its discretion in their admission.  We therefore conclude that the Petitioner has failed to establish deficient performance or prejudice, and he is not entitled to relief on this issue.

In his last issue, the Petitioner appears to argue that he is entitled to relief based on the cumulative error doctrine.  However, we have discerned no error in this case, and he is likewise not entitled to cumulative error relief.  State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010).

## CONCLUSION

Based on the analysis above, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. MCMULLEN, JUDGE